852 F.2d 740
 26 Fed. R. Evid. Serv. 647
 Dennis Waldon STOCKTON, Petitioner-Appellee,
v.
COMMONWEALTH OF VIRGINIA; Edward W. Murray, Director,
Virginia Department of Corrections,
Respondents-Appellants.
Dennis Waldon STOCKTON, Petitioner-Appellant,
v.
COMMONWEALTH OF VIRGINIA; Edward W. Murray, Director,
Virginia Department of Corrections, Respondents-Appellees.
 Nos. 87-4002(L), 87-4003.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 1, 1988.
Decided July 22, 1988.
 
 Frank Snead Ferguson, Asst. Atty. Gen. (Mary Sue Terry, Atty. Gen., Virginia B. Theisen, Asst. Atty. Gen., Richmond, Va., on brief), for respondent-appellant Commonwealth of Virginia et al.
 Louis Martin Bograd (Donald G. Frankel, Kevin S. Marks, Joseph G. Poluka, Pamela K. Chen, Arnold & Porter, Washington, D.C., on brief), for petitioner-appellee Stockton.
 Before WIDENER, ERVIN and WILKINSON, Circuit Judges.
 WILKINSON, Circuit Judge:
 
 
 1
 Dennis Stockton was tried before a jury in the Circuit Court of Patrick County, Virginia, for the murder for hire of Kenneth Arnder. The guilt phase of Stockton's trial lasted for two days and, on March 23, 1983, the jury found him guilty of capital murder. The sentencing phase of the trial took place the following day. The jury recommended that Stockton be sentenced to death.
 
 
 2
 Stockton petitioned for federal habeas relief pursuant to 28 U.S.C. Sec. 2254, seeking to have his death sentence vacated and his conviction overturned. He contends that his sentence was tainted by prejudicial comments made to the jurors during their deliberations. While several members of the jury lunched at the Owl Diner on the day they deliberated Stockton's sentence, the proprietor of the diner approached the jurors and told them, among other things, that "they ought to fry the son of a bitch." We think such communications denied Stockton his right to a fair and impartial jury during the sentencing deliberations. We therefore affirm the district court's judgment vacating Stockton's death sentence. The state shall have the choice of either reducing his sentence to one of life imprisonment or sentencing him anew.
 
 
 3
 Stockton also claims that he was denied a fair trial on several grounds, including other extrajudicial contacts with jurors during the guilt phase of his trial, the admission of testimony describing his commission of a second murder, improper jury deliberations, and prosecutorial misconduct. We hold that Stockton was not denied a fair trial in the guilt phase of the proceedings, and we affirm the judgment of the district court denying habeas relief on his conviction.
 
 I.
 
 4
 On July 25, 1978, the body of eighteen year old Kenneth Arnder was discovered in a remote area of Surry County, North Carolina. Arnder had been shot in the head and both of his hands had been severed at the wrists. The parties stipulated that the cause of death was either the wound to the head, the severing of the hands, or both.
 
 
 5
 Stockton was arrested for Arnder's murder on June 25, 1982, in Patrick County, Virginia, a small county in southside Virginia with a population of less than 20,000 people. He was tried in the Circuit Court of Patrick County on March 21 to 24, 1983. His arrest and trial generated considerable local publicity. The print and broadcast media featured reports of the trial and pretrial proceedings as well as accounts of investigations connecting Stockton to several local murders, the discovery of the victims' bodies, and Stockton's past criminal history. In one newspaper article, Stockton was labeled "Surry County's public enemy number one" and compared to Charles Manson.
 
 
 6
 The evidence presented against Stockton at his trial was substantial. Randy Bowman testified that he, Stockton, Ronnie Tate, "Sunshine" Hatcher, and Diane and Tommy McBride were at McBride's home in June of 1978 when Tommy McBride offered Bowman $1,500 to kill the "Arnder boy," who had offended McBride in a drug deal. Stockton offered to do the job because he needed to make money. Stockton and McBride then went into another room together.
 
 
 7
 Arnder's mother testified that she last saw her son alive on July 20, 1978. That evening Arnder left his mother's home with Stockton to camp out in a picnic area in Patrick County to avoid difficulties arising from his involvement with some stolen property. Arnder's body was found five days later. Further evidence at trial included Robert Gates' testimony that in July of 1979 he witnessed Stockton shoot and kill Ronnie Tate for "running his mouth" about the Arnder killing. There was also testimony that on several occasions Stockton had admitted to killing Arnder.
 
 
 8
 On March 23, 1983, the jury found Stockton guilty of the murder for hire of Kenneth Arnder. On the following day, pursuant to Virginia's bifurcated trial procedure for capital crimes, the jury fixed Stockton's sentence.
 
 
 9
 During the sentencing deliberations, the jury broke for lunch. At least two groups of jurors, one group of three women and another of three or four men, ate at the Owl Diner, a restaurant near the courthouse. The atmosphere at the diner was a casual one. One juror recognized two court deputies at a nearby table and James Blackard, a witness subpoenaed to testify at the trial, was seated with his wife in a booth across the aisle from a group of male jurors. The Blackards testified that Glenn Puckett, the owner of the Owl Diner, approached the jurors and inquired whether they had reached a decision yet. One of the men replied that they had all decided except for "one damned woman." Puckett then commented to the jurors that he thought "they ought to fry the son of a bitch." According to the Blackards, Puckett remained and conversed with the jurors for several minutes.
 
 
 10
 The jurors resumed sentencing deliberations after the lunch break. They concluded that Stockton was likely to "commit criminal acts of violence that would constitute a continuing serious threat to society" and that his conduct was "outrageously or wantonly vile, horrible, or inhuman" and fixed his sentence at death.
 
 
 11
 The trial court held a post-conviction hearing on June 7, 1983. At the hearing, the court took testimony concerning the Owl Diner incident. The court concluded from the evidence presented that Puckett had asked members of the jury whether they had reached a decision, but that Stockton had suffered no prejudice as a result of that query. The court also indicated that something else may have been said but that the witnesses did not know what it was. The court then entered final judgment against Stockton and imposed the death sentence.
 
 
 12
 Stockton perfected a direct appeal of his conviction to the Supreme Court of Virginia. The conviction and sentence were affirmed. Stockton v. Commonwealth, 227 Va. 124, 314 S.E.2d 371 (1984). Certiorari was denied by the United States Supreme Court. Stockton v. Virginia, 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984).
 
 
 13
 After some further state proceedings, Stockton's execution was scheduled for October 3, 1986. Stockton petitioned the United States District Court for the Western District of Virginia for a stay of execution and federal habeas corpus relief. The stay was granted on October 2, 1986. A hearing was then held on the habeas petition, and on June 18, 1987, the district court granted Stockton a writ of habeas corpus vacating his death sentence and granting him a new sentencing hearing or a reduction of his sentence to life imprisonment. The Commonwealth appeals and Stockton cross appeals the district court's denial of relief with respect to his conviction.
 
 II.
 
 14
 Glenn Puckett approached a group of jurors while they lunched at the Owl Diner on the day they deliberated Stockton's sentence. After inquiring about the progress of their deliberations, Puckett told the jurors that he thought "they ought to fry the son of a bitch." The import of this comment is the primary issue in this case.[1]
 
 A.
 
 15
 The Commonwealth argues that the defendant bears the burden of establishing that unauthorized third party communications with members of the jury resulted in actual juror partiality. It is true that the defendant must first establish both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict. Once such a contact has been established, however, the government bears the burden of demonstrating the absence of prejudice.
 
 
 16
 The Sixth Amendment guarantees a criminal defendant the right to trial by an impartial jury. No right touches more the heart of fairness in a trial. The fact that there was here no threat or inducement, no invasion of the sanctity of jury room deliberations, does not still the sense that something went awry. The Supreme Court has long recognized the dangers to impartiality posed by unauthorized communications between third parties and members of the jury. Almost a century ago the Court declared that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." Mattox v. United States, 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892). In Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the Court reinforced the rule set forth in Mattox:
 
 
 17
 In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial ... The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.
 
 
 18
 Id. at 229, 74 S.Ct. at 451.
 
 
 19
 The rules of evidence make it difficult for either party to offer direct proof of the impact that an improper contact may have had on the deliberations of the jury. See Fed.R.Evid. 606(b); Mattox, 146 U.S. at 149, 13 S.Ct. at 53 (quoting Woodward v. Leavitt, 107 Mass. 453 (1871)) ("the evidence of jurors as to the motives and influences which affected their deliberations, is inadmissible either to impeach or to support the verdict"). The right to an impartial jury belongs to the defendant, however; thus a rebuttable presumption of prejudice attaches to the impermissible communication. While juror testimony concerning the effect of the outside communication on the minds of the jurors is inadmissible, the state may rebut the presumption of prejudice through whatever circumstantial evidence is available, including juror testimony on the facts and circumstances surrounding the extraneous communication. This circuit has held in the civil context that the party supporting the jury's verdict must overcome the rebuttable presumption of prejudice that attaches once an impermissible contact with the jury has been established. Haley v. Blue Ridge Transfer Co., 802 F.2d 1532, 1535-37 (4th Cir.1986). If this was true in the civil context, it would appear no less applicable to a criminal trial.
 
 
 20
 We cannot accept the Commonwealth's argument that the presumption of prejudice attaching to extrajudicial communications was overturned by the Supreme Court in Tanner v. United States, --- U.S. ----, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987) or Smith v. Phillips, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Neither of those cases dealt with the question at issue here--the effect of a third party communication to the jury about the case. In Tanner, the Court held that juror testimony concerning drug and alcohol use by members of the jury during the trial was inadmissible in a post-verdict evidentiary hearing under Rule 606(b) of the Federal Rules of Evidence and was not required by the Sixth Amendment. Tanner, 107 S.Ct. at 2750-51. The defendant's Sixth Amendment right to a competent and unimpaired jury was held to be amply protected by the opportunity to examine a juror's suitability during voir dire and to introduce non-juror evidence of juror misconduct and impairment in a post-verdict evidentiary hearing. Id. at 2751.
 
 
 21
 In Phillips, the Court declined to impute bias to a juror who, during the course of trial, applied for employment as an investigator with the district attorney's office. The Court again noted that the beliefs, biases, and preferences of every juror may be explored and exposed by the defendant at voir dire. Further, when some external manifestation of a juror's predisposition subsequently calls the juror's impartiality into question, the defendant is afforded the opportunity to establish the juror's actual bias. Id. 455 U.S. at 215-17, 102 S.Ct. at 945-46. Where, however, the danger is not one of juror impairment or predisposition, but rather the effect of an extraneous communication upon the deliberative process of the jury, the defendant's right to an impartial jury requires that the government bear the burden of establishing the nonprejudicial character of the contact. See, e.g., Haley, 802 F.2d at 1535-36 and n. 5 (civil case); United States v. Butler, 822 F.2d 1191, 1195-96 and n. 2 (D.C.Cir.1987); United States v. Littlefield, 752 F.2d 1429, 1431-32 (9th Cir.1985). But see United States v. Pennell, 737 F.2d 521, 532 (6th Cir.1984), cert. denied, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985).
 
 
 22
 Although neither Tanner nor Phillips dealt directly with extraneous communications to members of the jury, those cases are nonetheless instructive in any situation where a jury verdict is being impeached. The benefits of ensuring the finality of the jury's verdict and avoiding needless harassment of jurors by the losing party are relevant in all such cases. See Tanner, 107 S.Ct. at 2749-50. Thus, jury verdicts are not to be lightly cast aside. Our system of criminal justice rests in large measure upon a confidence in conscientious juror deliberations and juror attentiveness, both to the evidence at trial and to the instructions of the trial judge. This confidence is not to be displaced every time a third party communication reaches the ears of a juror during trial. See id. at 2747-48; Phillips, 455 U.S. at 209, 102 S.Ct. at 940. Thus, while a presumption of prejudice attaches to an impermissible communication, the presumption is not one to be casually invoked.
 
 
 23
 When this sequence of proof involves fact-finding by the state courts, those determinations must be afforded further deference in federal habeas proceedings. Sumner v. Mata, 449 U.S. 539, 550, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981). Testimony on the Owl Diner incident was taken by the state trial court in a post-conviction hearing. Unfortunately, the trial court failed to make a factual finding on the critical questions presented here: whether Puckett commented to the jurors that "they ought to fry the son of a bitch" and, if so, whether that juror contact was prejudicial. Since "the merits of the factual dispute were not resolved in the state hearings," the federal habeas court properly held an evidentiary hearing on the question. Townsend v. Sain, 372 U.S. 293, 313-16, 83 S.Ct. 745, 757-59, 9 L.Ed.2d 770 (1963); 28 U.S.C. Sec. 2254(d)(1).[2]
 
 B.
 
 24
 We agree with the district court that Puckett's comment posed a potential for prejudice that was too serious to ignore.
 
 
 25
 We note at the outset that Puckett did not deny making the offending remark. In fact, he testified before the district court that "knowing me, I could have said it." Excerpts from juror depositions and the testimony of James Blackard and Ginger [Blackard] Hall, who overheard the conversation, were also received by the court.
 
 
 26
 Based upon this evidence the district court found that
 
 
 27
 [t]he testimony of Blackard and Hall clearly shows that some of the jurors were contacted by Puckett. Their testimony is corroborated by some of the juror testimony as well as that of Puckett. Moreover, their testimony and the corroboration leave little doubt that the matter discussed by Puckett was the focus of the jury's deliberations, i.e., whether to impose a life or death sentence upon Stockton.
 
 
 28
 The district court further concluded that "it is just as clear that Puckett's comments were not 'innocuous.' Indeed, a comment could be no more pointed tha[n] 'I hope you fry the son-of-a-bitch.' Even the milder characterization of Puckett's comments as being 'nasty' or 'unfavorable to Stockton' would not permit a finding of being 'clearly innocuous.' " These findings are amply supported by the evidence.
 
 
 29
 The circumstances surrounding Puckett's comments do not, as the Commonwealth suggests, rebut the presumption of prejudice that attaches to this contact. This was no mere offhand comment. Puckett knew that he was addressing his opinion to members of the jury--his comment about what should happen to Stockton was preceded by an inquiry as to whether the jurors had reached a decision. Further, the comment bore on the exact issue--whether to impose the death penalty--that the jurors were deliberating at that time. Puckett's comment was then followed by several minutes of conversation between Puckett and the jurors, the subject of which is unknown. While the Commonwealth disputes the district court's characterization of Puckett as "a rather prominent local figure," it is not unfair to assume that a local restaurant owner was a source or barometer of local sentiment. The fact that Puckett's comment was not mentioned in jury deliberations does not persuade us that it had no prejudicial impact upon the jurors' minds. Indeed, two jurors still remembered the essence of the Owl Diner incident four years after it occurred.
 
 
 30
 Emotional environments require that the deliberateness of jury decisionmaking be preserved. Stockton's trial generated intense publicity and interest within this small community. The details of the murder of which he stood accused understandably occasioned outrage. The casualness with which the trial was conducted stands in sharp contrast to this charged milieu. We do not hold that the trial court abused its discretion in refusing to grant a change of venue or to sequester the jury. Stockton, 314 S.E.2d at 380. We are troubled, however, by the trial court's failure to take more modest steps to protect the jurors from community sentiment. Throughout the brief trial and sentencing deliberations, jurors were simply released for lunch. They dined in small groups in restaurants near the courthouse frequented by the attorneys, witnesses, and court personnel. Contrast Andrews v. Shulsen, 600 F.Supp. 408, 419 (C.D.Utah 1984) (jurors kept together and away from others and provided a separate dining room). They were approached by interested citizens curious about the progress of their deliberations. Although many jurors attempted dutifully to ignore expressions of public opinion and to avoid commenting on the case, they were powerless to avoid contact with the public. As a result they were exposed to the type of pointed and prejudicial suggestion whose utterance encourages the all too human tendency to pursue the popular course.
 
 III.
 
 31
 Stockton challenges the validity of his underlying conviction on several grounds. We find no violation of Stockton's rights with regard to the guilt phase of his trial. We thus affirm the district court's denial of habeas relief with respect to the jury's verdict that Stockton was guilty of murder for hire.
 
 A.
 
 32
 Stockton argues that his conviction should have been reversed because the juror depositions ordered by the district court indicate that there were extrajudicial contacts with members of the jury during the course of the trial. We reject this contention for two reasons.
 
 
 33
 First, unlike the Owl Diner incident, no mention of these additional jury contacts was ever made at any stage of the state court proceedings. Although Stockton claims he learned of these contacts for the first time as a result of juror depositions conducted in federal court, he has failed to demonstrate sufficient cause for not attempting to pursue in state court a line of inquiry that surely was suggested by his claim of jury partiality as a result of the denial of his motions for sequestration of the jury and a change of venue. Raising stale claims for the first time in federal court is precisely what the Supreme Court has warned litigants to avoid. Murray v. Carrier, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); Wainwright v. Sykes, 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977) (criminal trial and sentencing in state court is the "decisive and portentous event").
 
 
 34
 Secondly, reversal is not required anytime a juror hears anything at all about a case. Even the most scrupulous jurors may not be able to avoid overhearing all comment on a trial. Jurors are not rendered "partial" simply because they become aware of the existence of negative community sentiment. "The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Smith v. Phillips, 455 U.S. at 217, 102 S.Ct. at 946. However, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable." Id.
 
 
 35
 The other alleged contacts differed markedly from the Owl Diner incident. While some of the jurors had the general impression that public sentiment disfavored the defendant, their recollection of specific instances of third party communications was vague. Juror Bowman recalled a neighbor telling her, "You probably know what I think, but I can't tell you." She testified that strangers occasionally commented that they thought Stockton was guilty. She "figured ... that most people were in favor of the death penalty," but she properly excused herself when people began to discuss the trial. Juror Hughes testified that "people naturally think 'well he shot this man in the head and cut his hands off, you're going to put the noose around his neck, right?' " When asked if anyone told him that Stockton should be given the death penalty, Hughes responded, "No, sure didn't."
 
 
 36
 As noted above, Stockton bears the initial burden of establishing both that the extrajudicial contacts occurred and that they were of such a nature as to reasonably cast doubt on the validity of the jury's verdict. See Haley, 802 F.2d at 1537 and n. 9. Stockton has failed to carry his burden in that regard. Other than the Owl Diner incident, there is no clear evidence of instances in which so pointed an expression of community displeasure was communicated directly to members of the jury. We are satisfied from the nature and context of these contacts that they were indeed innocuous and did not prejudice the jury's deliberation of Stockton's guilt or render that phase of his trial unfair.
 
 B.
 
 37
 We likewise find no merit to Stockton's claim that his right to a fair trial was violated by improper deliberations by subgroups of jurors. The district court found, and the record reveals, that the only evidence relating to charges of improper deliberations concerned conversations between three jurors who shared a ride to and from the courthouse. These conversations consisted in part of small talk about the manner in which the trial was being conducted and the appearance of certain witnesses. The question of defendant's guilt or innocence was not discussed. It is certainly permissible for jurors to carpool to and from court without giving rise to a question of subset deliberations. It may also be unrealistic to think that jurors will never comment to each other on any matter related to a trial. Even if these conversations violated the trial court's instructions to the jurors not to discuss matters relating to the trial, there is no evidence that the merits of the case were deliberated. There was thus no prejudice to the defendant as to warrant a new trial. See United States v. Klee, 494 F.2d 394, 396 (9th Cir.), cert. denied 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 61 (1974).
 
 C.
 
 38
 The evidence presented against Stockton at his trial included the testimony of Robert Gates, an eyewitness to the murder of Ronnie Tate. Gates testified that in July of 1979, he saw Stockton shoot and kill Tate for "running his mouth" about the Arnder murder. Stockton testified on his own behalf that he had killed Tate in self-defense when Tate, who was "real messed up on drugs," pulled a gun on him.
 
 
 39
 The state called Gates in rebuttal. Gates testified in graphic detail about how Stockton killed Tate in cold blood. He testified that Stockton shot Tate in the chest. Stockton then walked over to Tate and told him to get up or he would shoot him in the face. About five minutes after Stockton shot Tate the first time, Stockton shot Tate twice more as he begged for his life. Stockton then forced Gates to dig a grave for Tate's body and threatened to do the same thing to Gates if he talked about the murders.
 
 
 40
 Stockton reiterates here the claim previously raised on his direct state appeal, that this testimony was so inflammatory and prejudicial as to amount to a denial of his due process right to a fair trial. We agree with the Virginia Supreme Court, however, which held that "the testimony was so relevant and probative to the truth-finding process that its probative value greatly outweighed any prejudicial effect." Stockton, 314 S.E.2d at 383; see United States v. Pate, 426 F.2d 1083, 1086 (7th Cir.1970), cert. denied, 400 U.S. 995, 91 S.Ct. 469, 27 L.Ed.2d 445 (1971).
 
 As the Virginia Supreme Court observed:
 
 41
 The only reasonable inference which can be drawn from Gates' testimony is that Tate knew Stockton killed Arnder, and Stockton, believing Tate was telling others about the murder, killed Tate to silence him. Clearly, the two offenses were interrelated, and Gates' testimony showed both Stockton's guilty knowledge of Arnder's murder and his desire to conceal his guilt.
 
 
 42
 Stockton, 314 S.E.2d at 383.
 
 
 43
 It is true that the details of the Tate murder were gruesome, but this was unavoidable due to the nature of the act. Probative evidence of knowledge is not rendered inadmissible simply because it depicts a hideous crime. Moreover, the admissibility of evidence is generally a matter of state law which does not properly concern a federal habeas court unless it impugns the fundamental fairness of the trial. Grundler v. North Carolina, 283 F.2d 798, 802 (4th Cir.1960). Stockton was not denied due process by the introduction of this evidence, the relevance and probative value of which outweighed any possibility of unfair prejudice to him.
 
 D.
 
 44
 Stockton contends that Commonwealth Attorneys engaged in several acts of misconduct designed to discredit the testimony of Stockton and principal defense witnesses, which denied him due process. We find these contentions meritless.
 
 
 45
 Randy Bowman testified that in July of 1978, when he, Stockton, Ronnie Tate, "Sunshine" Hatcher, and Tommy and Diane McBride were at the McBrides' house, Tommy McBride offered Bowman $1,500 to kill Kenneth Arnder. He further testified that Stockton offered to do the job because he needed money. This testimony conflicted with that of Tommy and Diane McBride. Tommy McBride testified that he did not offer to pay Stockton, Bowman, or anyone else to kill Arnder. Diane McBride testified that the events described by Bowman never took place.
 
 
 46
 Stockton contends that the Commonwealth indicted Tommy McBride as the principal in the murder for hire of Arnder for the sole purpose of impeaching his testimony on behalf of Stockton. Both the Virginia Supreme Court and the federal district court found no evidence to support this claim. The fact that McBride's indictment was obtained two weeks before Stockton's trial, was served on the day McBride testified, and was dismissed three weeks after Stockton's sentence so McBride could be prosecuted in North Carolina does not give rise to an inference of an improper motive on the part of the state. In fact, any inference must be to the contrary since, under Virginia law, the indictment had to be brought by the action of a grand jury which must find probable cause to return a "true bill." See Virginia Code Sec. 19.2-191 (1983).
 
 
 47
 Furthermore, Stockton has failed to show that he was in any way prejudiced by the government's use of the indictment to impeach McBride. McBride's prior criminal record already put his credibility in doubt. McBride was allegedly the principal in the murder for hire. His involvement in the murder could have been argued with or without the indictment. McBride's incentive to deny hiring Stockton to kill Arnder remained the same whether or not he was under indictment, and Diane McBride was similarly interested in protecting her husband in either case. The evidence amply supports the state court's conclusion that Stockton failed to prove his allegations of improper motive and that, in any event, the indictment resulted in no prejudice to Stockton. Stockton, 314 S.E.2d at 387.
 
 
 48
 Stockton also alleges prosecutorial misconduct as a result of improper cross-examination of him by the state. No objection to this testimony was made until the day after it was presented. The Virginia Supreme Court found that Stockton had waived his objection to this evidence by failing to object contemporaneously to its introduction. See Stockton, 314 S.E.2d at 384 n. 2. The state court's finding of procedural noncompliance under state law binds the federal courts, and Stockton has failed to establish "cause and prejudice" for his failure to follow Virginia's contemporaneous objection rule. Wainwright v. Sykes, 433 U.S. at 86-87, 97 S.Ct. at 2506-07.
 
 E.
 
 49
 Stockton contends that the district court improperly refused to consider newly discovered evidence that Bowman had lied when he testified that Stockton accepted McBride's offer to pay $1,500 for the murder of Kenneth Arnder. The newly discovered evidence consists of the affidavit of Bowman's cellmate, Frank Cox, in which Cox stated that Bowman told him that "he [Bowman] had lied at the trial of Stockton." Stockton argues that Bowman's testimony was the only evidence that Arnder was murdered for hire and that evidence challenging the credibility of that testimony is highly material.
 
 
 50
 We disagree. To warrant a federal evidentiary hearing on the basis of newly discovered evidence, the "evidence must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." Townsend v. Sain, 372 U.S. at 317, 83 S.Ct. at 759. The grounds for habeas relief on the basis of newly discovered evidence are exceedingly narrow:
 
 
 51
 When public officers connive at or knowingly acquiesce in the use of perjured evidence, their misconduct denies a defendant due process of law. Recantation of testimony alone, however, is insufficient to set aside a conviction on the ground that the due process clause has been violated. A habeas corpus petitioner must show that the prosecutor or other government officers knew the testimony in question was false in order to prevail.
 
 
 52
 Thompson v. Garrison, 516 F.2d 986, 988 (4th Cir.1975) (citations omitted), cert. denied, 423 U.S. 933, 96 S.Ct. 287, 46 L.Ed.2d 263 (1975).
 
 
 53
 Stockton has made no allegations of prosecutorial misconduct with respect to Bowman's testimony. In addition, the evidence he proffers is not of such a nature as to bring about a different trial result. There has been no proffer that Bowman would himself recant his prior testimony and it is questionable whether Cox's hearsay testimony of Bowman's alleged statements would be admissible at trial. This hearsay evidence addressed only the credibility of Bowman's testimony, which had been contradicted by four other witnesses, including the defendant. Stockton is therefore not entitled to relief on this ground.
 
 IV.
 
 54
 The judgment of the district court denying habeas relief on Stockton's conviction of murder for hire is affirmed. The judgment vacating his death sentence and imposing a sentence of life imprisonment or awarding a new sentencing hearing is also
 
 
 55
 AFFIRMED.
 
 
 56
 WIDENER, Circuit Judge, concurring and dissenting:
 
 
 57
 I concur in those parts of the opinion which affirm the conviction and which otherwise deny relief, but, as to the question of jury bias, I respectfully dissent.
 
 
 58
 I doubt the validity of applying our Haley presumption of prejudice[1] in this case following the decision in Smith v. Phillips, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), although I recognize that Haley is the rule in this circuit. I also doubt that Federal Rule of Evidence 606(b) should be applied over literally so as not to permit the State to introduce at least some evidence from the jurors who heard any remarks by Puckett to say whether or not such remarks had any effect on them personally, this without invading the deliberations in the jury room and so as to uphold, not impeach, the verdict. To hold, as we do, that any extraneous communication to a juror is presumably prejudicial unless innocuous, and then prevent the State from proving lack of prejudice by the very juror involved, very nearly places the State in a box from which escape is difficult if not impossible. Such questions of bias are freely explored on voir dire prior to a trial, and limited exploration of the same "with great caution in the use of such evidence" would seem to have been the rule absent Rule 606(b). Mattox v. United States, 146 U.S. 140, 148, 13 S.Ct. 50, 52, 36 L.Ed. 917 (1892). See also Smith v. Phillips, 455 U.S. 209, 217 n. 7, 102 S.Ct. 940, 946, n. 7, 71 L.Ed.2d 78 (1982), which did not consider Rule 606(b). Indeed, Remmer v. United States, 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956) (Remmer III ), requires the inquiry at the required hearing to include the "...communication with the juror and the impact thereof upon him then, immediately thereafter, and during the trial...." 350 U.S. at 379, 76 S.Ct. at 426. If the Constitution imposes a hearing on the States, as here, then the rules of the hearing must also be imposed regardless of Rule 606(b).
 
 
 59
 While the above protests may turn out to be little more than lamentations about a result I think is unjustified on account of the almost casual comments of a restaurateur, our decision, I think, has a pronounced and basic flaw. That is that Stockton is procedurally barred from raising this claim under Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and subsequent like cases. Since Stockton could have raised the question on direct appeal and did not, absent cause and prejudice, which are not present here, he is procedurally barred under state law from its consideration in a state court, and we may not consider it now. Cole v. Stevenson, 620 F.2d 1055 (4th Cir.1980) (en banc). See also Murray v. Carrier, 477 U.S. 478, 489, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).
 
 
 60
 An examination of the opinion of the Supreme Court of Virginia in 314 S.E.2d 371 (Va.1984), of the 19 assignments of error in that case and of the briefs filed discloses no mention of jury bias on account of the offending statement by Puckett so pronounced as to be worthy of argument in the sense presented here.
 
 
 61
 The minor consequence that was laid to this is corroborated by an examination of Stockton's petition for collateral relief by way of habeas corpus filed in the Circuit Court of Patrick County, and the written opinion of that court denying relief, which petition was prepared by attorneys instead of by Stockton, and which included 11 claims for collateral relief, including 7 charges of ineffective counsel, but which never mentioned any question of jury bias caused by an outside communication such as is now claimed.
 
 
 62
 In Picard v. Connor, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), the Court held that a federal petitioner who is a state prisoner must "... present the state courts with the same claim he urges upon the federal courts." 404 U.S. at 276, 92 S.Ct. at 512. The Court pointed out that "This is not a case in which factual allegations were made to the federal courts that were not before the state courts." 404 U.S. at 276, 92 S.Ct. at 512. It was a case in which a state prisoner had never brought before the state courts a Fourteenth Amendment claim of denial of equal protection of the laws. Rather, his claim, upon the same facts, was whether the indictment procedure in Massachusetts was consistent with the Fifth Amendment's requirement of grand jury indictment. While the prisoner had claimed in the state courts under the Fourteenth Amendment as it respected his Fifth Amendment claim, he had not presented his Fourteenth Amendment equal protection claim to the state courts. The Court held that the prisoner had not "... provided the Massachusetts 'court with "an opportunity to apply controlling legal principles to the facts bearing upon [his] constitutional claim." ' " 404 U.S. at 277, 92 S.Ct. at 513. And, most importantly, the court added "To be sure, respondent presented all the facts. Yet the constitutional claim the Court of Appeals found inherent in those facts was never brought to the attention of the state courts." 404 U.S. at 277, 92 S.Ct. at 513.
 
 
 63
 I see no significant difference in the case before us and Picard. While Picard was a case involving exhaustion of state remedies, its procedural rule for presenting a claim should apply here. No claim is made of cause which prevented the raising of the claim. Accordingly, I suggest that Wainwright should control the disposition of this case.
 
 
 64
 I am supported in my reasoning by the record of the state trial, and the likely reason for the claim not having been perfected heretofore. Everyone connected with the case simply thought there was nothing to it, and there was not.
 
 
 65
 After the conclusion of the state trial, the attorneys moved to set aside the verdict on the ground of jury bias by reason of the now complained of statements by Puckett. The state court had a hearing at which all interested parties were permitted to participate and at which evidence was taken which met the requirements of Remmer I and Smith. The trial court heard the testimony of a Mr. and Mrs. Blackard, who were not jurors but were present, and of one Cockram who had been the foreman of the jury.
 
 
 66
 Mrs. Blackard testified on direct examination:
 
 
 67
 Q. All right, now, tell the Judge what you saw and what you heard.
 
 
 68
 A. They were sitting together and, ah, Glen Puckett, the owner of the diner, came up and was talking to them about the trial. He wanted to know if they had reached a verdict and one of them, I did not know which one, said that all of them had decided except for one woman, something to that effect is what was said.
 
 
 69
 And, on cross-examination, she added nothing:
 
 
 70
 Q. Mrs. Blackard, the only statement made was--the only statement made by this third person, Mr. Puckett, was he asked if they had reached a verdict and the response was that, ah, they were all in agreement except for one lady.
 
 
 71
 A. Something to that effect, yes.
 
 
 72
 Her husband, Blackard, on direct examination, testified:
 
 
 73
 Q. With Mr. Puckett. And how do you know they were talking about the trial and not talking about going fishing or hunting or something?
 
 
 74
 A. Well, ah, Glen [Puckett] came up and asked them if they'd come to a verdict yet and, ah, the best of my knowledge, they said they had all except for one, ah, one person, no, he said for one reason and, ah, Mr. Puckett said what's that; he said haven't you guessed yet, it's a damned woman. And then, ah, as I recall, Glen Puckett says something to the effect, said I hope they fry that son-of-a-bitch.
 
 
 75
 But, on cross examination, one of his responses was:
 
 
 76
 Q. Mr. Blackard, other than the statement made by the--by Mr. Puckett in which he inquired about whether they had reached a verdict, that was really the only conversation that you heard, isn't that right?
 
 
 77
 A. That's true.
 
 
 78
 After the conclusion of the testimony and argument of counsel, the court delivered its oral decision, which is quoted in full:
 
 
 79
 THE COURT: All right, gentlemen. If I understood Mr. and Mrs. Blackard's statement as to what they heard was said, was that this Mr. Puckett asked if they had reached a decision and some comment was made they all had decided but one woman. I feel that the statement in itself is not prejudicial, not harmful and Mr. Puckett says they didn't discuss anything any further. Mr. and Mrs. Blackard seem to suspect that maybe something else was said but they don't know what was said. So, based upon that, I see no harm or prejudice in the statement that was made and I'll overrule the motion.
 
 
 80
 From the trial court's opinion, we see that it found as a fact that "Mr. Puckett asked if they had reached a decision but some comment was made that they all had decided but one woman." It further found as a fact that "Mr. and Mrs. Blackard seem to suspect that maybe something else was said but they don't know what was said." Both of these findings are quite justified by the testimony. While it is true that Blackard testified on direct examination that Puckett had said "I hope they fry that son-of-a-bitch," it is just as true that on cross-examination that Blackard testified that it was true that "... other than the statement made by the--by Mr. Puckett in which he inquired about whether they had reached a verdict, that was really the only conversation that we heard, isn't that right?" (The latter part of the last sentence is clumsy grammar, but its import is such that I do not wish to lose effect by any accusation of quoting out of context.)
 
 
 81
 I think that the trial judge was not required to accept Blackard's testimony that Puckett had said he hoped they would fry the son-of-a-bitch. Blackard, in one breath, stated that such offending statement had been made, and, in the next breath, denied it, so the trial judge was entitled to believe as he obviously did that the statement had not been made.[2] This was entirely a question of the weight of the evidence and the credibility of the witnesses, a matter peculiarly entrusted to a trial judge, especially upon oral testimony, as here.[3] In addition, the finding of the state trial judge is supported by 28 U.S.C. Sec. 2254(d). I further note that in Smith the finding of the state trial judge of no "prejudice against the [respondent]", 455 U.S. at 213, 102 S.Ct. at 944, was accorded the presumptively correct protection of Sec. 2254(d). 455 U.S. at 218, 102 S.Ct. at 946. I see no reason the "no harm or prejudice" finding of the state trial judge here should not be accorded the same presumptive validity. There is no convincing evidence to the contrary. Sumner v. Mata, 449 U.S. 539, 551, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981).[4]
 
 
 82
 Accordingly, I would reverse the grant of the writ.
 
 
 
 [1]
 The Commonwealth argues that Stockton is procedurally barred from raising in his federal habeas proceeding the claim that he was denied a fair trial by an impartial jury as a result of the Owl Diner incident. See Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). We disagree. Although the issue was not framed with the precision that one would prefer, Stockton's briefs to the Virginia Supreme Court raised the question of jury impartiality in light of Puckett's comments to the jurors in the Owl Diner and the general emotionalism that surrounded his trial. In addressing the trial court's refusal to grant a change of venue, Stockton argued in his briefs:
 A witness testified that the foreman and two other jurors were at the Owl Diner having lunch and he heard the owner discussing the case briefly with those jurors. According to the witness, the restaurant owner had said to the foreman that he hoped "they fry that son of a bitch." ... So now we must wonder: was the verdict the product of the quiet, cool impartiality of jurors who truly stood "indifferent" to the cause, or is the verdict tainted by all the above factors? ... The fact that twelve good men and women may have tried their best to give the defendant a fair and impartial trial is of no moment. The question is whether they stood "indifferent to the cause" or impartial as a deliberative body. It would ignore human nature and common sense not to be seriously and gravely concerned about the impartiality of the jury that convicted Stockton.
 Stockton's briefs "fairly presented" his constitutional claim of juror partiality to the Virginia Supreme Court giving the state courts "a fair opportunity to consider ... [that] claim and to correct [the] asserted constitutional defect." See Picard v. Connor, 404 U.S. 270, 276-77, 92 S.Ct. 509, 512-13, 30 L.Ed.2d 438 (1971). In sum, we do not believe that Stockton's claim is procedurally barred on federal habeas by virtue of a failure to raise it before the Virginia Supreme Court.
 
 
 [2]
 In the state trial court hearing James Blackard testified that Glenn Puckett "came up and asked [the group of jurors] if they had come to a verdict yet.... And then Glen Puckett says something to the effect, said I hope they fry that son-of-a-bitch." Ginger Blackard testified that "Glen Puckett, the owner of the diner came up and was talking to them about the trial. He wanted to know if they had reached a verdict, and one of them ... said that all of them had decided except for one woman." On cross-examination, she stated that Puckett "sat down and talked to them but I wasn't paying any attention to what they were talking about." The jury foreman, Gary Cockram, also testified at the hearing. He testified that "[o]ther than the comment of are you about to reach a decision ... no other discussion that I recall took place concerning the case."
 After hearing this testimony the trial court stated:
 If I understand Mr. and Mrs. Blackard's statement as to what they heard was said, was that this Mr. Puckett asked if they had reached a decision and some comment was made they had all decided but one woman. I feel that statement in itself is not prejudicial, not harmful and Mr. Puckett says they didn't discuss anything further. Mr. and Mrs. Blackard seem to suspect that maybe something else was said but they don't know what was said. So, based upon that, I see no harm or prejudice in the statement that was made and I'll overrule the motion.
 Two things concern us regarding the trial court's conclusions. Contrary to the trial court's statement, Puckett had not testified at the state post-trial hearing. Secondly, James Blackard's testimony specifically mentioned the offending comment, but the trial court did not address it in its holding. We obviously do not require state factfinding to address all the minutiae of defendants' claims, but it is not unrealistic to expect more than an ambiguous response to contentions of this consequence. We therefore agree with the district court that "the trial court did not make findings as to the issue of Puckett's comments to the jurors at the Owl Diner. This issue was not specifically addressed when the ruling was made."
 
 
 [1]
 Haley is a rule of federal procedure merely, following Remmer I which was the same. We now apply it as a constitutional imperative without regard to United States v. Frady, 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), which emphasized the higher burden on collateral attack of a criminal judgment. I acknowledge, however, that Smith, 455 U.S. at p. 221, 102 S.Ct. at 948, may be construed as interpreting Remmer I as constitutionally "requiring a post trial hearing on juror bias."
 In Tanner v. United States, --- U.S. ----, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), the Court did construe Rule 606(b) as limiting juror testimony to impeach the verdict, but it dealt with self imposed drinking during the trial, a matter it treated as intrinsic bias rather than bias from an extrinsic source, as here.
 
 
 [2]
 The hearing before the state trial judge showed that Blackard had been convicted of four felonies. In the intervening four years between then and the hearing in the district court, he had been convicted of an additional five felonies, a total of nine. Yet, we are asked not to follow the state trial judge's assessment of credibility and weight of evidence, although Blackard was not even corroborated by his wife
 
 
 [3]
 The majority takes the trial judge to task because the trial judge recited that Puckett had testified at the hearing on the motion, which he had not, rather than Cockram, who had. While I think it is apparent that this substitution of names was nothing more than a slip of the tongue or of a stenographer's pencil, I have not referred to Cockram's testimony in the body of this dissent so as not to detract from the trial judge's finding. If Cockram's testimony were considered, there is even more reason to give weight to the trial court's finding:
 Q. This, ah, you may feel that this puts you on the spot a little bit but I have to--sometimes I have to do that, ah, do you recall the events of that Thursday at lunch well enough to disagree with what Mr. and Mrs. Blackard said? Are you saying that that didn't happen, that Mr. Puckett didn't come by and he didn't discuss the case with you or the people sitting at your booth?
 A. Other than the comment of are you about to reach a decision, which was sort of a normal question, everybody we met that day asked us, ah, no other discussion that I recall took place concerning the case.
 Q. Do you recall whether Mr., ah, or whoever the man was that came over to the table made commentary to you about what ought to be done with the defendant or what he hoped was done with the defendant?
 A. Ah, He didn't make any comments to me.
 Q. All right. Did you hear him make any comments to others at the table about that?
 A. That's really hard for me to say. Like I say, he did not come to talk to me because I don't know the man, so, I don't.
 Q. All right. Did you hear him or someone other than him, who came over to the table, make comments to your fellow jurors? Did you hear him say anything like that?
 A. Not that I thought had any effect or event pertained really to the case. Ah, It was typical comments. We hope you finish up this afternoon, ah, I don't really remember anything in particular because I think it was a point that most of the jury members, I think, felt the way I did. We wanted a time to get away and think a little bit and I wasn't in the mood for a conversation.
 
 
 [4]
 We should also take into consideration that the state hearing was held June 7, 1983, only 68 days after the verdict, while the hearing in the district court was April 20, 1987, with depositions being taken March 17 and 18, 1987, some four years later. Thus, any difference in testimony should be resolved in favor of the fresher recollection available in the state court