**UNITED STATES of America, Plaintiff,**

v.

**Loren PICCARRETO, Joseph Geniola a/k/a "Joe G", Joseph LoDolce a/k/a "Joe Lo" Defendants.**

**Cr. No. 87–177L.**

United States District Court, W.D. New York.

June 12, 1989.

Anthony Bruce and Gregory West, Sp. Attys., Rochester, N.Y., for plaintiff.

Harold Boreanaz, Buffalo, N.Y., Anthony Leonardo, Jr., William A. Muoio, and Richard A. Miller, Rochester, N.Y., for defendants.

LARIMER, District Judge.

Defendants filed written motions for a new trial, Fed.R.Crim.P. 33, or in the alternative, for a hearing concerning certain alleged juror misconduct. Defendant Joseph LoDolce filed a written motion on April 27, 1989 and defendants Joseph Geniola and Loren Piccarreto sent written letter-memoranda to the Court which were also filed on April 27, 1989. The Government, by memorandum filed May 2, 1989, opposed the motions.

On May 9, 1989, defendant LoDolce advised the Court that he was discharging attorney William Muoio and on that day I entered an order confirming that fact. LoDolce obtained new counsel, Richard A. Miller, Esq., who entered his appearance on May 16, 1989. The Court granted Miller and other counsel until June 2, 1989 within which to submit additional papers on the motions.

On June 9, 1989, LoDolce advised the Court that he wanted to withdraw the motion for a new trial filed by his former attorney because he did not want a new trial. The Court granted that motion. This decision deals with the motions for a new trial or for a hearing filed by defendants Geniola and Piccarreto.

Based on my review of the evidence submitted on these motions, my conversations with the jurors, my assessment concerning their credibility, and my observation of the jury's requests during deliberations, I am convinced that there is no basis to overturn the verdict or to conduct further inquiry.

We expect much from jurors in a case of this length and complexity. The jurors were compelled to abandon their normal routine and employment and serve for over two months. Now their deliberations have been subjected to public scrutiny. In my view, this jury worked diligently, conscientiously and honorably to arrive at a verdict. In my view, there is no basis to overturn that considered judgment.

## PROCEDURAL BACKGROUND

Trial in this case commenced on October 31, 1988 before a jury and six alternate jurors and continued for two months until December 20, 1988 when the jury retired to deliberate. The jury deliberated for seven days and returned a verdict on December 29, 1988.

During the course of deliberations the jury sent out approximately thirty-nine separate notes requesting additional instructions, the reading of testimony and the playing of tapes received in evidence. Specifically, the jury requested testimony be read back on five separate occasions; they requested that tapes be replayed approximately fourteen times and they requested instructions on various legal matters approximately thirteen times.

On March 3, 1989, just prior to sentencing and over two months after the verdict, the Court received a seven-page handwritten letter (Exhibit 1) from one of the alter-

nate jurors, denominated here as Juror No. 13. (To protect the identity and privacy of the jurors, the Court has established a number code [Exhibit 9] to identify the jurors.)

Juror No. 13 stated in the first sentence that the letter was written "on behalf of Mr. Joseph LoDolce." The juror set forth his [1] view of some of the evidence and his opinion that LoDolce should have been acquitted of the charges. The bulk of the letter related to the juror's protestations concerning LoDolce's innocence.

At the end of the letter, the juror noted that one of the other jurors, Juror No. 24, had "discussed the trial" with other jurors during the course of the trial and that Juror 24 told him during the trial that Juror 24 "knew they did it and that we would just have to sit through the trial until the end."

In order to establish the authenticity of the letter, the circumstances surrounding its issuance and to explore the matters relating to juror conduct, I questioned Juror No. 13 in my chambers on the record on March 8, 1989.

At that meeting, I discovered that the juror had spoken with William Muoio, Esq., counsel for LoDolce, approximately five times on the telephone and once in person after the verdict and prior to March 3, 1989 when I received the juror's letter. The juror advised the Court that he was upset about the verdict and he initiated the call to Muoio. The juror told Muoio that he was not happy with the verdict and asked "if there's anything I can do to help." (Tr. March 8, 1989, p. 15). Muoio advised the juror to write to the Court with his concerns.

The juror's letter reflects his great interest and concern—not for all three defendants—but only for Joseph LoDolce. The letter concludes with the statement that "my mind will not rest until I feel I have tried everything that I could to help this man." (Exhibit 1, p. 7).

The next day, March 9, 1989, I met with all counsel and advised them about the letter and my meeting with Juror No. 13. I told all counsel that I would provide them with unredacted copies of the letter and the transcript of my conversation with Juror No. 13 and would await counsels' suggestions as to what should be done. (Tr. March 9, 1989, pp. 4–5). I directed counsel not to publicly discuss the matter or contact any juror until further order of the Court.

Between March 9 and April 13, 1989, the Court interviewed three other jurors and met with counsel on three other occasions to discuss the matter. Especially at the meeting of April 13, 1989, I discussed at length my opinion that there was not such grave misconduct or juror bias to warrant a new trial.

Counsel were given an opportunity to make written applications concerning the matter and these motions followed.

## DISCUSSION

■ The trial court has wide discretion in determining how to pursue a post-verdict jury inquiry. *United States v. Calbas*, 821 F.2d 887, 896 (2d Cir.1987); *United States v. Hillard*, 701 F.2d 1052, 1064 (2d Cir.), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983).

Throughout this trial, there has been extensive publicity which continues unabated during the post-verdict phase. In view of Fed.R.Evid. 606(b), and to protect the jurors from being harassed and intimidated, I felt it necessary to see that all post-trial investigation of jurors be conducted under my direct supervision. *See United States v. Moten*, 582 F.2d 654, 665 (2d Cir.1978), *citing, Miller v. United States*, 403 F.2d 77, 82–83 (2d Cir.1968). Counsel was advised of the Court's intentions at all stages of the proceedings and all counsel were allowed to make suggestions and to submit questions to the Court for consideration when questioning jurors. The Court believes very strongly that this proceeding

---

**1.** Since the identity of all jurors is not disclosed, the use of the masculine pronoun throughout is used arbitrarily when referring to each juror.

should not become an adversarial proceeding which intrudes into the jury's deliberations. *See Calbas*, 821 F.2d at 896.

■ Courts should be reluctant to "haul jurors in" after they have rendered a verdict and probe for potential instances of bias, misconduct or extraneous influences. These unnecessary post-verdict inquiries may lead to "evil consequences: subjecting juries to harassment, inhibiting jury room deliberation, burdening courts with meritless applications, increasing temptations for jury tampering and creating uncertainty in jury verdicts." *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir.1989).

At the outset, all counsel conceded—as they must—that a post-verdict inquiry into the validity of a jury verdict is drastically limited because of the scope of Rule 606(b). That rule prohibits any juror from testifying as to "any matter or statement" occurring during the course of the jury's deliberations, or to "the effect of anything upon that juror's mind or emotions as influencing his verdict" or concerning the juror's "mental processes." The juror may only testify as to whether "extraneous prejudicial information" was improperly brought to the juror's attention.

Rule 606(b) embodies the longstanding common law rule prohibiting the admission of juror testimony to impeach a jury verdict except where there is an allegation that there was an "extraneous influence" on the jury. *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2739, 2745–46, 97 L.Ed.2d 90 (1987).

This rule is supported by substantial policy considerations, including the need to assure full and frank discussion in the privacy of the jury room, to prevent the harassment of jurors by losing parties, and to preserve the community's trust in a system that relies on the decisions of lay people. *Tanner*, 107 S.Ct. at 2749–50.

In *Tanner* the Supreme Court discussed the real danger in allowing extensive post-verdict inquiries into the bases for the jury's verdict.

"[i]t is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror miscon-

duct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict seriously disrupt the finality of the process.... Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community trust in a system that relies on the decision of laypeople would all be undermined by a barrage of post verdict scrutiny of juror conduct.

*Tanner*, 107 S.Ct. at 2747–48.

Therefore, Rule 606(b), as it has been interpreted, prevents any inquiry into or critique of the jury's deliberative process unless there is evidence of some extraneous prejudicial information that was put before the jury.

It is clear that the case before me does *not* involve a situation where "extraneous" information was put before the jury. There is no evidence of that.

Mr. Muoio's motion papers refer (p. 4) to the fact that when he met privately with Juror 13 in January 1989, the juror claimed that Juror 24 had uttered derogatory ethnic remarks. Juror 13 made no such allegation to the Court, however, in either the letter to the Court (Exhibit 1) or in his discussions with the Court in chambers on March 8, 1989. Therefore, I have not considered the allegation.

■ In making my assessment that there was no misconduct requiring a new trial, I must also weigh and consider the context in which these alleged statements of Juror 24 were brought to my attention. The first hint of any problem was made two months after the verdict by an alternate juror who did not participate in the deliberations. This alternate juror had not been reticent about bringing other matters to the Court's attention during trial. On two occasions during trial, he brought to my attention matters relating to a confrontation with one of the lawyers in the case, which turned out to be a misunderstanding on that juror's part as to what was said, and he advised my chambers about comments he heard a prospective juror make during voir dire. I make this point for this

reason: If the comments of Juror 24 occurred as alleged by Juror 13, and were as noteworthy as now charged, it seems strange to say the least that these matters were not brought to my attention sooner. Furthermore, these issues were raised in a letter to the Court which was designed by the writer to help one of the defendants. It is also clear after listening to Juror 13 and reading his letter, that the juror does not especially like Juror 24. The juror referred to the fact that Juror 24 called him "stupid" (Exhibit 1) and Juror 13 stated that he became "disgusted" with Juror 24 during the trial (Exhibit 1). All of these matters are factors that I must weigh in determining what happened and whether the jury's deliberations were affected.

When distilled, defendants' claims are two-fold: (1) That Juror No. 24 "discussed the case" during the trial in spite of the Court's repeated admonition not to do so; and/or (2) That Juror 24 was biased or not impartial based on comments that he made to other jurors as the trial progressed.

### Discussion Of Case By Jurors

Based on my interviews with the jurors, it is clear that some comments were made, at least by Juror 24, concerning the trial as it progressed. From my review, most of these comments do not appear to have been frequent or extensive.

Juror 24 conceded to me that he may have made comments during trial about how witnesses acted and testified and he may have commented on the ability of both the prosecutor and defense counsel (Tr. March 16, 1989, p. 6). All of the jurors whom I questioned conceded that Juror 24 made comments and statements about the case prior to deliberations.

■ Leaving aside for a moment the content of the comments, I find that the mere fact that Juror 24, and others, may have engaged in some discussion about the case prior to deliberations is not of such consequence as to require a new trial.

It is true that the Court admonished the jurors during the trial not to discuss the case until it was submitted to them. Nevertheless, violations by one or more

jurors of this directive does not require that this two-month trial be repeated.

In light of the nature of the charges, the nature of the testimony, the length of the trial, and the cast of characters who testified, it is not too surprising that a juror may have made some comments about the proceedings as the trial progressed.

In *Stockton v. Com. of Va.*, 852 F.2d 740, 747 (4th Cir.1988), the Court discussed whether a new trial was warranted because three jurors who shared a ride to the courthouse discussed the case on occasion. The Court stated that: "It may also be unrealistic to think that jurors will never comment to each other on any matter relating to a trial." In a similar vein, the Court in *United States v. Klee*, 494 F.2d 394, 396 (9th Cir.), *cert. denied*, 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 61 (1974), cited with approval Judge Woodrough's comment in *Winebrenner v. United States*, 147 F.2d 322 (8th Cir.1945), that: "No normal honest Americans ever worked together in a common inquiry for any length of time with their mouths sealed up like automatons or oysters."

The fact that some of the jurors, contrary to my instructions, occasionally discussed the case during the course of the eight-week trial does not compel a new trial. Although such conversations, to the extent that they occurred, violated this Court's instructions to the jurors not to discuss the case among themselves, there is no evidence that these preliminary discussions shaped the final deliberations or that they improperly influenced any of the jurors or prejudiced the defendants. *See United States v. Carmona*, 858 F.2d 66, 69 (2d Cir.1988); *Klee*, 494 F.2d at 396. (No new trial required even though majority of jurors had discussed the case and had expressed premature opinion of defendant's guilt during trial.)

Furthermore, even if conversations on the merits occurred, it would be improper under Rule 606(b) to engage in extensive inquiry as to how these comments affected the jurors during deliberations. Therefore, the mere fact that some jurors prematurely

discussed aspects of the case does not warrant a new trial.

### Juror Bias

██ The heart of defendants' motions is that Juror 24 was biased because of comments he made to other jurors during trial. Of course, that notion is highly suspect based on the objective evidence as to what the jury did in this case. The jury acquitted LoDolce of the main substantive RICO count and determined that four of the predicate acts concerning the defendants were not proven.

It is also noteworthy that the juror making the initial allegation—Juror 13—was an alternate juror. As such, this juror did not participate in the jury's deliberations and has no information or knowledge whatsoever as to what actually occurred during the seven days of jury deliberations. Perhaps if this juror had participated in the lengthy deliberations, this issue would not have even been raised. All of the jurors who actually participated in the deliberations advised the Court that the deliberations were thorough and open and that each juror had a chance to express his view.

Juror 13, the alternate, believed that Juror 24 made his remark about the guilt of the defendants on the second day of trial. Another juror that I questioned, Juror 48, thought that Juror 24 may have made a similar remark in his presence at approximately the mid-point of the trial (Tr. April 4, 1989, p. 5). Juror 48 said that he and other jurors ignored the remark and one juror said that Juror 24 "don't [sic] know what the hell he's talking about." (Tr. April 4, 1989, p. 6).

Juror 31 was also questioned. He denied ever hearing Juror 24 make any remarks about the defendants' guilt. He admitted that Juror 24 made some comments but he was not sure precisely what they were. He believed that it might have related to "the attitudes of the defendants or the attorneys or something like that." (Tr. April 7, 1989, p. 7). He believed that the comments came "mostly in the middle, towards the end" of the trial. (Tr. April 7, 1989, p. 6). Juror 24 emphatically denied

the claims of Juror 13 that he said that the defendants were "guilty." (Tr. March 16, 1989, pp. 6–7).

The thrust of defendants' motions are that Juror 24 had a pre-conceived bias of guilt. I do not believe that the evidence establishes this. Defendants have not demonstrated that the juror came to trial with any preconceived notion or bias.

What appears to have occurred, and I so find, is that these unfortunate comments of Juror 24 were made in *reaction* to the evidence as it developed. I believe that what has been established here is not evidence of pre-disposition but the juror's untimely opinion or impression about the strength of the Government's case as it progressed. This is certainly corroborated by my contact with the jurors during my interviews with them.

Juror 31 said that Juror 24 never gave an opinion of defendants' guilt but "[h]e might have felt that the evidence was fairly strong against the defendants." (Tr. April 7, 1989, p. 7).

Juror 48 claimed that Juror 24 made "little remarks" throughout the trial. For example, on one day, after the jurors "heard a piece of testimony from one of the witnesses" (Tr. April 4, 1989, p. 8), Juror 24 stated an opinion as to the guilt of one of the defendants.

Even Juror 13's remarks demonstrate that Juror 24's comments were not said in a vacuum but as a *reaction* to a witness' testimony. It is clear that the statements made to him were in reaction to the testimony of the Government's first witness, Anthony Oliveri, who testified as an informant about the inner workings of an organized crime organization and especially about a meeting held in Rochester where certain defendants and associates were inducted into this organization. That testimony was graphic and chilling.

Juror 24's comments to Juror 13 appear to be directly related to Oliveri's testimony (Tr. March 8, 1989, p. 8). He expressed an opinion that "they were all there" which relates to the fact that Oliveri testified that all of the defendants were present at the

induction ceremony. It appears that based on that testimony, the juror was impressed with the weight of the evidence at that point.

Juror 13 stated that he was "dumbfounded" that Juror 24 "believed everything that Mr. Oliveri said." (Tr. March 8, 1989, p. 31). The comments he attributed to Juror 24 "definitely" happened at the time Oliveri testified (Tr. March 8, 1989, p. 31).

In my view, all we have here is a juror's premature reaction to the evidence as the evidence was presented. All of the juror's comments seemed related to specific pieces of testimony.

Juror 24 indicated how seriously he took his role in the proceedings. He advised the Court that there is a vast difference between "thinking somebody is guilty" and "proving it" (Tr. March 16, 1989, p. 12). Of course, that is precisely what a conscientious juror should do; that is, put aside his subjective *feelings* and insist that the Government prove guilt. Juror 24 said that the whole case really did not finally "come together for him until the summations" (Tr. March 16, 1989, p. 6).

Having sat through a two-month long trial with this jury and having conducted personal interviews with a number of the jurors, this court has gained a first-hand insight into their respective frame of mind, *Neron v. Tierney*, 841 F.2d 1197, 1202 (1st Cir.1988), and has been able to assess the jurors' demeanor and credibility. *See United States v. Williams*, 737 F.2d 594, 612–13 (7th Cir.1984); *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977); *Morgan v. United States*, 399 F.2d 93, 95 (5th Cir.1969).

This jury as a group worked very hard during the trial and deliberations. They were attentive, took exhaustive notes during the trial and labored intensely during the lengthy deliberations. My assessment is that each of the jurors, including Juror 24, conscientiously adhered to his oath as a juror. Whether or not one juror may have unfortunately commented prematurely on his view of the case, the objective facts demonstrate that this jury deliberated conscientiously and with discrimination. I have already alluded to the verdict and the fact that there was an acquittal and several predicate acts not proven.

The premature comments of Juror 24 do not require a new trial. *See Klee*, 494 F.2d at 396. The remarks were ignored by the jurors (Tr. April 4, 1989, pp. 6–7), and had no affect on the deliberations. (Tr. April 7, 1989, pp. 10–11). Defendants have failed to demonstrate any pre-conceived "bias" or partiality that requires a new trial.

### CONCLUSION

Defendant Geniola and defendant Piccarreto's motions for a new trial or for a hearing are denied in all respects.

IT IS SO ORDERED.