# UNITED STATES of America

v.

## Eric M. FREEDLANDER.

### Cr. No. 91–00018–01–R.

United States District Court,
E.D. Virginia,
Richmond Division.

Oct. 26, 1993.

David T. Maguire, Asst. U.S. Atty., Richmond, VA, for plaintiff.

Eric M. Freedlander, pro se.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, Senior District Judge.

This matter is before the Court on Freedlander's motion, pursuant to 28 U.S.C. § 2255, to vacate, set aside or correct the sentence imposed on him. For the reasons stated below, the Court denies the motion.

### I. *Facts*

The petitioner, Eric M. Freedlander, was convicted by a jury on June 26, 1991 of 79 counts of an 83 count indictment charging him with conspiracy, making false reports to a financial institution, bank fraud, wire fraud, travel fraud and misapplication of financial

institution funds.[1] Each of these counts stemmed from a wide-ranging scheme involving the fraudulent sale and servicing of second mortgages. Counts 1 and 83, conspiracy and misapplication of financial institution funds, were committed after the sentencing guidelines came into effect; therefore, the guidelines were applied to yield a nine-year sentence. For the remaining counts, all of which were pre-guideline violations, Freedlander's sentence was suspended in favor of a five-year term of probation to commence upon his release. The defendant was also ordered to pay approximately $70 million in restitution to a number of financial institutions.

Freedlander bases his motion to vacate, set aside or correct sentence on several grounds:

a. the sentence violated the Constitution's prohibition on *ex post facto* laws;

b. his counsel failed to call certain witnesses, thus impairing his defense;

c. his counsel prematurely concluded his direct examination, thus denying him his right to fully testify;

d. his counsel refused to remove a tainted juror;

e. his counsel misrepresented that co-counsel would be obtained, and he was generally denied effective assistance of counsel for the reasons set forth above.

## II. *Analysis*

### A. *Violation of Ex Post Facto Prohibition*

Freedlander contends that the Court used the version of the Sentencing Guidelines in effect at the time of his sentencing to calculate his sentence rather than the guidelines in effect at the time of the offence, thereby retroactively applying a more onerous guideline in violation of the Constitution's prohibition on *ex post facto* laws.[2] Specifically, Freedlander argues that the two upward departure components of his 108–month sentence constituted a disguised retroactive application of the 1991 version of guideline § 2F1.1, which was more onerous than the 1987 version.

In imposing a sentence of 108 months, the Court applied the 1987 version of guideline § 2F1.1 in the following way:

| Guideline Section | Description | Level |
|---|---|---|
| 2F1.1(a) | Fraud and Deceit | 6 |
| 2F1.1(b)(1)(L) | Increase for loss over 5M | + 11 |
| 2F1.1(b)(2) | More than minimal planning | + 2 |
| | BASE OFFENSE LEVEL | 19 |
| 3B1.1(a) | Organizer Enhancement | + 4 |
| | INITIAL OFFENSE LEVEL TOTAL | 23 |
| | INITIAL GUIDELINE RANGE | (46 to 57 months [3]) |
| 2F1.1 Applic. Note 9 | Upward departure for loss of confidence in an important financial institution [4] | + 4 |
| 2F1.1 Applic. Note 10 | Upward departure for a loss which substantially exceeds $5M [5] | + 3 |
| | OFFENSE LEVEL TOTAL | 30 |
| | GUIDELINE RANGE | (97 to 120 months) |

---

1. These crimes violated 18 U.S.C. §§ 371, 1006, 1344, 1343, 2314 and 657, respectively.

2. *See* U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed.").

3. The Court found that the petitioner's Criminal History Category was I.

4. The 1987 version of Note 9 provided, "Dollar loss often does not fully capture the harmfulness and seriousness of the conduct. In such instances, an upward departure may be warranted. Examples may include the following: ... (e) the offense caused a loss of confidence in an important institution...."

5. The 1987 version of the Sentencing Guidelines provided in Note 10, "The adjustments for loss do not distinguish frauds involving losses greater than $5,000,000. Departure above the applicable guideline may be warranted if the loss substantially exceeds that amount."

It is an *ex post facto* violation to apply a more onerous guideline provision that was not in effect on the date of the crime. *Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). But since every component in the calculation of Freedlander's sentence is grounded in the 1987 version of guideline § 2F1.1, no factual basis exists for Freedlander's argument that the later more onerous 1991 amendments were applied. Admittedly, the Court referred to a later amendment to § 2F1.1 in deciding that a four-level upward departure for loss of confidence under Note 9 was reasonable. Specifically, the Court noted that the version of the guidelines in effect at sentencing provided for a 4–point enhancement when an offense "substantially jeopardize[s] the safety and soundness of a financial institution."[6] However, this mere reference does not convert the Court's ruling into a disguised application of the later guideline and is not prohibited by law.

Freedlander also notes that the Court's 3–point enhancement under Note 10 corresponds to the 3–point increase made by the 1991 guidelines to the 1987 guidelines for losses exceeding $5 million.[7] But if the Court had applied the guidelines in effect in 1991 to the estimated $70 million loss figure for which the petitioner was responsible, the petitioner's base offense level would have increased by 6 points to 17.[8]

Freedlander disputes the weight that the application notes should be given, but he ignores the fact that the Court is authorized to use these notes and may, in appropriate circumstances, depart from the guideline range. *See* 18 U.S.C. § 3553(b); U.S.S.G. Ch. 1, Pt. A, 4(b) (policy statement on departures).[9] The Fourth Circuit has identified a two-prong test to determine when a departure from the guidelines is warranted.[10] Under the test, the court must first determine whether a particular aggravating or mitigating circumstance was not adequately taken into consideration by the Sentencing Commission. *United States v. Summers*, 893 F.2d 63, 66 (4th Cir.1990).[11] If the court determines that the circumstance was not, it must next engage in a factfinding mission to determine if the circumstance is supported by facts in the case. *Id.* If so, the court may depart from the sentencing guidelines range if it further determines that the circumstance is of sufficient importance and magnitude that a sentence different from the guidelines sentence should result. *Id.*

Here, the Court based the two upward departures on two aggravating factors it thought were not adequately taken into consideration: (1) Freedlander's acts helped

---

6. United States Sentencing Commission, *Guidelines Manual* § 2F1.1(6) (Nov. 1990).

7. The guidelines in effect in 1991 provided for a 14–point increase in offense level for losses of more than $5 million, 3 points greater than the 11–point increase mandated by the 1987 guidelines.

8. The guidelines in effect in 1991 provided for a 17–point increase in offense level for losses of more than $40 million.

9. The Fourth Circuit has acknowledged the guidance on departures that the Commission gives in its commentary. *See United States v. Summers*, 893 F.2d 63, 67 (4th Cir.1990) (stating that district courts may use the Commission's official commentary for guidance and noting that "[i]n commentary accompanying specific guidelines and in policy statements, the Commission has expressly identified circumstances that may war-

rant a departure, commonly known as 'Commission-identified' departures.")

10. In arriving at the test, the court referred to the language of 18 U.S.C. § 3553(b), which allows departures where the court finds that an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines. Though the court construed the section as it existed in 1990, the essential language had not been substantially changed from the way it existed in 1987 when Freedlander committed his offenses.

11. In *Summers*, the Federal Circuit upheld the district court's determination that an overstatement of the seriousness of the defendant's criminal history category may be a circumstance not adequately taken into consideration. It held, however, that the extent of the district court's departure below the appropriate guideline range was unreasonable.

cause the loss of confidence in an important institution, First Jersey Savings and Loan Association, and (2) the loss substantially exceeded the highest loss level cited ($5 million) under the specific offense characteristic. In fact, the Sentencing Commission, in commentary to § 2F1.1, specifically recognized the propriety of upward departure in these circumstances. This fact reveals that the Commission recognized that in some cases, the offense level provided in § 2F1.1 would be inadequate to address certain substantial aggravating factors. The extent of the Court's departure based on § 2F1.1, applic. note 9 was reasonable in light of the fact that more than half of First Jersey's insolvency when it went into receivership resulted from losses experienced on the Freedlander portfolio. Furthermore, the Court's departure based on § 2F1.1, applic. note 10 was reasonable. To determine the extent of this departure, the Court applied an estimated loss figure of $70 million to the sequential levels of increased losses to yield an increase of 14 points to the base offense level. Since the section already mandated an 11–point increase for losses exceeding $5 million, the court made an upward departure of 3 points to make 14.

Moreover, as Freedlander himself admits, this issue was raised on appeal to the Fourth Circuit.[12] That court's failure to address the issue in its opinion refusing to reverse the petitioner's conviction does not change the fact that the issue was squarely placed before the court.

The imposition of an enhancement provision that was enacted after the date of the petitioner's offense would violate the Constitution's *ex post facto* clause. *See United States v. Morrow*, 925 F.2d 779 (4th Cir. 1991). But in this case every component of Freedlander's guideline calculation was in force on the date of his offenses. Furthermore, the departures were justified and reasonable. Therefore, Freedlander's *ex post facto* claim lacks merit.

## B. *Ineffective Assistance of Counsel Claims*

In order to show ineffective assistance of counsel, the petitioner must show that (1)

counsel's representation fell below an objective standard of reasonableness and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 2064–65, 2068, 80 L.Ed.2d 674 (1984).

### 1. *Failure to Call Witnesses*

■ Freedlander contends that his lawyer, Russell Williams, failed to call several witnesses who were crucial to his case. He claims that Williams agreed with him that these witnesses were essential to his presentation of a complete defense, but that Williams nonetheless failed to call them at trial. This failure, according to Freedlander, prevented him from controlling his own defense. On the other hand, Williams states in an affidavit that, based on interviews with the witnesses at issue or with their lawyers, he concluded that the witnesses were unreliable or would have contributed nothing to the defense strategy. (*See* Resp. in Opp'n to Def.'s § 2255 Mot. Ex. II at 2–3 [hereinafter Williams Aff.].)

In light of his lawyer's statements, Freedlander has failed to sustain his burden of proving ineffective assistance of counsel. The lawyer interviewed prospective witnesses or talked with their counsel and, based on these conversations, made a tactical decision not to call them. *See Goodson v. United States*, 564 F.2d 1071, 1072 (4th Cir.1977) ("Absent a showing that the tactical decision of counsel was so unreasonable in light of the need for the testimony that it amounted to a deprivation of an attorney who acted within 'the range of competence demanded of attorneys in criminal cases,' ... we are reluctant to second guess the tactics of trial lawyers.") Freedlander cites no specific manner in which the testimony of any of the witnesses he claims to have wanted to call would have helped him. In fact, he fails to give the

---

**12.** Freedlander was given permission to file a supplemental *pro se* brief in which he raised the *ex post facto* issue.

substance of their testimony at all. The Court concludes that the witnesses would not have helped Freedlander had they been called; therefore, he was not prejudiced by the failure to call them.

■ Freedlander also states that his attorney waited so late to start the process of establishing his psychological profile that he got to meet only once with a psychologist. He contends that the amount of time was inadequate to prepare a personal or family profile of him. But Williams states that after reading the psychological report, which was prepared after a lengthy interview with Freedlander, he determined that the psychological material developed would seriously undermine the defense. (*See* Williams Aff. at 3.) Once again, Freedlander fails to establish that a psychological profile would have provided exculpatory evidence. Therefore, because Freedlander has failed to show that his lawyer's representation fell below an objective standard of reasonableness or that a reasonable probability exists that, but for the lawyer's alleged errors, the outcome of the trial would have been different, he has failed to sustain his burden.

### 2. Defendant's Right to Testify

■ Freedlander contends that his lawyer was so intimidated by suggestions from the Court that the lawyer cut Freedlander's testimony drastically short and prevented him from testifying fully and presenting a complete defense.[13]

A defendant has the right to testify on his own behalf in a criminal case. *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). In the present case, however, the Court clearly afforded the petition-

er this right. The direct testimony lasted at least three hours and filled 169 pages of trial transcript. Much of the testimony was in narrative form, thus allowing the petitioner maximum latitude to testify as he pleased. The petitioner also testified extensively on cross-examination, which filled up 99 pages of transcript. Therefore, it cannot be credibly argued that he did not have the opportunity to testify.[14]

Furthermore, Williams' affidavit makes clear that he made a conscious tactical decision to conclude Freedlander's direct examination. The lawyer states that he determined that the substance and manner of the petitioner's testimony was hurting rather than helping the defense in that the petitioner came "across to the jury as someone who very well could have done the things that the prosecution's eyewitnesses had testified to." (Williams Aff. at 5.) Under these circumstances, Freedlander has failed to show that his lawyer's conduct was unreasonable or incompetent; therefore, he has failed to show ineffectiveness of counsel.

### 3. Tainted Juror

■ Freedlander alleges that, in the course of his trial, it was brought to the Court's attention that a juror, Ms. Cole, had a social relationship with a witness for the government, Edward Levine, and had discussed the case with the witness, but had failed to reveal either the relationship or the discussion to the Court during *voir dire* or after learning of the presence of the witness in the case. Freedlander argues that the Court's questioning of the juror did not rectify her tainted status, and that his lawyer should have asked that she be removed from

13. Specifically, the petitioner states that when the Court admonished Williams to ask precise questions rather than inviting long narrative answers from the petitioner, Williams decided to pull the petitioner from the stand so that the petitioner would not invite more of the Court's disfavor. (*See* Def.'s Mot. at 11–12.)

14. The petitioner cites to several cases upholding a defendant's right to choose whether to testify on his own behalf and forbidding rules that arbitrarily exclude material portions of a defendant's or a witness' testimony. *See, e.g., Rock v. Arkan-*

*sas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). None of the cases, however, are factually on point. In this case, the defendant was allowed to testify extensively on his own behalf. Furthermore, he points to no testimony he would have given that was essential or that could have changed the jury's verdict. It would seem that the right to testify does not give a defendant the right to stay on the stand indefinitely.

the panel.[15] Freedlander also alleges that both the Court and his attorney erred by failing to determine what information Levine had given the juror about the case before the trial.

Freedlander's lawyer, Williams, states that he failed to ask that Cole be removed because he had no reason to doubt her profession of impartiality and because "I reasoned at the time that even if Juror Cole were biased at all, it would be in favor of Levine's message, which was not, in my judgment, ineluctably unfavorable to Eric." (Williams Aff. at 6.) Williams states that the government offered Levine's testimony to suggest that Freedlander had known all along about the illegal business activities because he was a member of the family, but that Levine could not and did not testify to any specific knowledge on Freedlander's part. (*Id.*) Williams also states that Levine's cross-examination testimony arguably supported the conclusion that Freedlander's mother was the mastermind. (*Id.*) These statements reveal that Williams made a conscious, tactical decision to leave Cole on the jury.[16] Freedlander disputes Williams' analysis. He contends that Levine's testimony clearly indicated that he controlled the Freedlander business and that Levine had reservations about working with him.

To obtain collateral relief based on trial errors to which no contemporaneous objection was made, Freedlander must show (1) "cause" excusing his double procedural default at trial and on direct appeal, and (2) "actual prejudice" resulting from the errors of which he complains. *United States v. Frady*, 456 U.S. 152, 167–68, 102 S.Ct. 1584, 1594–95, 71 L.Ed.2d 816 (1982). To satisfy the second prong of this test, Freedlander must do more than show a possibility of prejudice. Rather, he must "show that his attorney's failure to raise the issue [of Cole being an allegedly tainted juror] worked to his actual and substantial disadvantage and infected his entire trial with error of constitutional dimensions." *See Felton v. Barnett*, 912 F.2d 92, 97 (4th Cir.1990); *Frady*, 456 U.S. at 170, 102 S.Ct. at 1595.[17] Though Freedlander speculates as to the effect that Levine's testimony may have had on Cole, he cannot make this showing.

Moreover, this Court was well within its discretion, even after the start of the trial, in keeping Cole on the jury panel, particularly where defense counsel was satisfied with Cole's colloquy with the Court and did not seek her replacement. *See United States v. Reis*, 788 F.2d 54, 59 (1st Cir.1986).

The cases to which Freedlander cites involve direct appeals of convictions based on improper contacts with jurors. In *Stockton v. Commonwealth*, 852 F.2d 740, 743 (4th Cir.1988), the court held that the defendant's right to an impartial jury had been violated

---

**15.** Cole brought the issue of her acquaintance with Levine to the Court's attention on the second day of trial when she learned that Levine would be a witness in the case. Once Cole disclosed this prior contact, the Court questioned the juror in the presence of the defendant and his counsel as follows:

> THE COURT: But now that you have recognized him, there is nothing about your relationship that will prevent you from giving the parties a fair and impartial trial?
> JUROR NO. 16 (COLE): No.
> THE COURT: All right. Thank you, ma'am, for calling it to my attention. Call your first witness.
> (Tr. at 335.)

**16.** The government contends that it is understandable that Freedlander and his lawyer would fail to be concerned about Levine given Levine's lack of current knowledge of the Freedlander business. The government states that Levine's trial testimony confirmed his collateral role in the case of identifying early financial statements and giving background on the earlier years of the Freedlander companies.

**17.** With respect to the first prong of the test, Freedlander contends that he urged his lawyer to challenge Cole or to move to replace her with an alternate in the trial Court and that he did not raise the issue on appeal to the Fourth Circuit because a collateral record had to first be established. But neither of these reasons is satisfactory. First, Freedlander's attorney states that he recalls that "Eric seemed willing to trust my judgment concerning jury selection matters." (Williams Aff. at 6.) In addition, Freedlander is simply mistaken in his belief that he could not have raised this issue on direct appeal.

when the owner of the diner where the jurors took a lunch break during their deliberations told a group of jurors that he thought "they ought to fry the son of a bitch." The court stated that a defendant must first establish both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict. *Stockton,* 852 F.2d at 743. Once such a contact has been established, however, the court stated that the government bears the burden of demonstrating the absence of prejudice. *Id.* Similarly, in *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), the United States Supreme Court overturned a guilty verdict where two deputy sheriffs who were the principal prosecution witnesses were in continuous and intimate association with the jurors.

These cases involve more egregious circumstances than the ones involved in Freedlander's case. Nevertheless, the cases may have aided Freedlander in argument to the Fourth Circuit if he had raised the tainted juror issue on direct appeal. Since he did not, the cases cited by the government dispose of his contentions.

As the government points out, Freedlander filed his own supplemental brief on direct appeal to the Fourth Circuit, yet he never raised the alleged tainted juror issue. Freedlander contends that he has instead raised this issue in a collateral § 2255 proceeding because an appellate court will not review an issue on direct appeal in cases where a collateral record has not yet been established. For this proposition, he cites to *United States v. Gambino,* 788 F.2d 938, 950 (3rd Cir.1986) (stating that "[a] litany of cases in this circuit firmly establish our general policy against entertaining ineffective assistance of counsel claims on direct appeal....") But, in this case, a record was established by the trial Court when that Court questioned Cole and found that she could properly continue on the jury. More importantly, if raised on direct appeal, this issue would have been decided on its merits without reaching the issue of effectiveness of counsel. Therefore, the issue was ripe for

Fourth Circuit review at the time Freedlander appealed his sentence.

Furthermore, the petitioner, having consciously waived raising the issue involving juror Cole on direct appeal, should be barred from raising it in a §. 2255 petition. *See United States v. Emanuel,* 869 F.2d 795, 796 (4th Cir.1989) (holding that defendant waived his claim that sentencing court failed to comply with duties for dealing with controverted matters in presentence investigation report or summary, where movant failed to seek direct review). The Court finds persuasive on this issue the fact that one of the major issues raised by Freedlander in his direct appeal to the Fourth Circuit was the adequacy of the overall *voir dire* during the jury selection process. Thus, the Court finds that it was not proper for the defendant to bring a portion of his jury *voir dire* argument on direct appeal as a trial balloon, then raise piecemeal, other jury matters in a collateral attack years later.

### 4. *Understaffed Defense Team*

Freedlander contends that his lawyer had never before handled a white collar criminal case, though his case was "touted as the largest white collar case ever in the Fourth Circuit." (Def.'s Mot. at 6.) Furthermore, Freedlander contends that Williams had no secretary or other assistants in his office to work on the case and that Williams misrepresented that other lawyers would assist in handling the case. (*Id.* at 6, 8.)

Freedlander's characterization conflicts with that of Williams, who states that two experienced lawyers assisted him in the early stages of the case. (*See* Williams Aff. at 4.) In addition, the Court appointed a professional fraud investigator and an expert on economic crimes to assist Williams in preparing and presenting the defense. Williams states that the investigator assisted at trial, the economic crimes expert testified at trial on behalf of the defense, and he deemed other help unnecessary. (Williams Aff. at 4.)

Furthermore, Freedlander fails to point to any specific way in which the defense was either incompetent or prejudicial before or

during trial. Indeed Williams sifted through thousands of pages of deposition transcripts and was therefore able to demonstrate that two of the government's key witnesses, Ben Freedlander and Marc Glazer, had made prior statements that were materially inconsistent with their trial testimony. In addition to this effective cross-examination, Williams introduced a number of witnesses and a significant number of pertinent exhibits. Therefore, Freedlander is unable to show that his counsel's representation was unreasonable.

### III. *Conclusion*

Therefore, because the bases for Freedlander's § 2255 motion lack merit, the motion is denied.