# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Richard Alexander Murdaugh, Appellant.

Appellate Case Nos. 2023-000392 and 2024-000576

———————

Appeal from Colleton County
Clifton Newman, Circuit Court Judge
Jean Hoefer Toal, Circuit Court Judge

———————

Opinion No. 28329
Heard February 11, 2026 – Filed May 13, 2026

———————

## REVERSED AND REMANDED

———————

Richard A. Harpootlian, Phillip Donald Barber, and Andrew R. Hand, all of Richard A. Harpootlian, P.A.; James Mixon Griffin and Margaret Nicole Fox, both of Griffin Humphries LLC, all of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Deputy Attorney General Donald J. Zelenka, Senior Assistant Deputy Attorney General Samuel Creighton Waters, Senior Assistant Deputy Attorney General Melody Jane Brown, Senior Assistant Deputy Attorney General Mark Reynolds Farthing, and Assistant Attorney General Joshua Abraham Edwards, all of Columbia, for Respondent.

———————

**PER CURIAM:** For six weeks in early 2023, the eyes of the nation focused on Colleton County, where the State prosecuted notorious former attorney Richard Alexander Murdaugh for the murders of his wife, Maggie, and son, Paul. Both the State and Murdaugh's defense skillfully presented their cases to the jury as the trial court deftly presided over this complicated and high-profile matter. However, their efforts were in vain because Colleton County Clerk of Court Rebecca Hill placed her fingers on the scales of justice, thereby denying Murdaugh his right to a fair trial by an impartial jury. Our justice system provides—indeed demands—that *every* person is entitled to a fair trial, which includes an impartial jury untainted by external forces bent on influencing the jury toward a biased verdict. Although we are aware of the time, money, and effort expended for this lengthy trial, we have no choice but to reverse the denial of Murdaugh's motion for a new trial due to Hill's improper external influences on the jury and remand for a new trial. Because we order a new trial on this basis, it is not necessary that we review every evidentiary issue Murdaugh raises on appeal from his conviction. However, we address the admissibility of Murdaugh's financial crimes to offer guidance on this thorny issue to the trial court on remand.

## I.    Factual and Procedural Background

On March 2, 2023, Murdaugh was convicted of the murders of his wife, Margaret Murdaugh, and his son, Paul Murdaugh, as well as two counts of possession of a weapon during the commission of a violent crime. The trial court (Judge Newman) sentenced him to life in prison. While his direct appeal of these convictions was pending at the court of appeals, Murdaugh filed a motion to hold the appeal in abeyance to allow him to file a motion for a new trial; the court of appeals granted this motion. On October 27, 2023, Murdaugh moved for a new trial, asserting Hill tampered with the jury by (1) advising it not to believe Murdaugh's testimony and other defense evidence; (2) pressuring it to reach a quick guilty verdict; and (3) misrepresenting information to the trial court in an attempt to have the court remove a juror she believed to favor the defense. He attached affidavits from several jurors to support his motion. Chief Justice Beatty appointed former Chief Justice Toal (post-trial court) to preside over this motion, as the trial court judge had recused himself.

The post-trial court conducted the hearing of this motion on January 26 and 29, 2024. During the hearing, the post-trial court asked each juror (1) if the guilty verdict was an accurate statement about their verdict at that time; (2) whether their verdict was "based entirely on testimony, evidence, and law presented" in the case; (3) whether

they heard Hill make any comment about the case before the verdict; and (4) whether their verdict was influenced in any way by any communications by Hill.

Juror X, who testified on the first day of the hearing, acknowledged hearing Hill say before Murdaugh's testimony, "looks like the defendant is going to testify[;] [t]his is an important day," or "this is an epic day," and that it was rare for a defendant to testify. Juror X said these statements did not impact the verdict.

Juror Z, who submitted one of the affidavits Murdaugh attached to his motion for a new trial, was the first juror to testify on the second hearing date. When asked whether she heard Hill make any comments about the case, Juror Z responded that Hill said "[t]o watch his actions" and "[t]o watch him closely." Juror Z added that Hill said more, but she could not remember anything else. Juror Z explained Hill's statements influenced her finding Murdaugh guilty because "[t]o me, it felt like she made it seem like he was already guilty." At the State's request, the post-trial court questioned Juror Z about her affidavit, addressing each paragraph in turn. Juror Z's affidavit gave a more detailed recitation of Hill's comments:

> Toward the end of the trial, after the Presidents' Day break but before Mr. Murdaugh testified, the clerk of court, Rebecca Hill, told the jury "not to be fooled" by the evidence presented by Mr. Murdaugh's attorneys, which I understood to mean that Mr. Murdaugh would lie when he testifies.
>
> She also instructed the jury "to watch him closely" immediately before he testified, including [to] "look at his actions" and "look at his movements," which I understood to mean he was guilty.

Juror Z testified that when the jury began deliberations, Hill told the jury, "[T]his shouldn't take us long." In addition to referencing Hill's statements, Juror Z averred in her affidavit, "I had questions about Mr. Murdaugh's guilt but voted guilty because I felt pressured by the other jurors."

After reviewing the affidavit, the post-trial court questioned Juror Z:

> I asked you previously was your verdict on March 2, 2023, influenced in any way by communications from Becky Hill, the clerk of court. You answered that question yes.

> In light of what you said in the affidavit, which is: "I had questions about Mr. Murdaugh's guilt but voted guilty because I felt pressured by the other jurors[,]" [i]s that answer that I just read a more accurate statement of how you felt?

Juror Z answered affirmatively. The post-trial court then asked if she stood by the affidavit, and she answered yes. Juror Z subsequently submitted an affidavit to clarify her testimony, in which she explained that she felt influenced to find Murdaugh guilty by Hill's remarks before she entered the jury room, and once deliberations began, she felt additional pressure from the other jurors to reach a guilty verdict. Although the post-trial court did not admit this affidavit, it accepted it as a proffer. Thus, the affidavit is part of the record before this Court.

Juror P testified that on the day Murdaugh was to take the stand, Hill made a comment to "watch his body language." He denied Hill's comments influenced him in any way.[1] The remaining jurors testified that they did not hear Hill make any comments about the case, and they were not influenced by any comments Hill made.

Following the jurors' testimony, the State called Hill as a witness. Although Hill denied making most of the comments the jurors related, she admitted that on the day Murdaugh testified, and within earshot of some jurors, she spoke to the bailiff about Murdaugh's decision to testify. She also stated that she gave the jurors a "little talk," instructing them to pay attention and that the day was a "big day." She denied attempting to influence the jury.

In discussing her book, *Behind the Doors of Justice: The Murdaugh Murders*,[2] Hill claimed "literary license" to explain some of the more dramatic passages. She denied wanting a guilty verdict because it would sell more books, claiming the outcome of the trial did not matter to her, but she acknowledged as true a passage in

---

[1] Following Juror Z's testimony, the post-trial court informed the parties that the other jurors who were waiting for their turn to testify had tuned in to the proceeding on Court TV. The jurors either denied viewing the proceeding or, if they saw it, asserted it would not influence their testimony.

[2] As her book's title suggests, it turns out Hill was quite busy behind the doors of justice, thwarting the integrity of the justice system she was sworn to protect and uphold. The book was pulled from publication because Hill plagiarized portions of it.

which she stated she believed Murdaugh was guilty but was concerned he would be acquitted because of his family's goodwill in the community.

The post-trial court also questioned Hill about the favors she granted the media. Hill denied allowing the press to view the exhibits, including the sealed exhibits; however, she subsequently pled guilty to perjury stemming from this denial. Although the post-trial court limited discussion of Juror 785,[3] whom the trial court dismissed on the day deliberations began for allegedly discussing the case with third parties, it allowed Murdaugh to question Hill about bringing to the trial court's attention social media posts that Hill mistakenly believed were from Juror 785's ex-husband. Hill claimed that the juror was very talkative while Hill walked her to the trial court's chambers and volunteered that there were restraining orders on her ex-husband when they divorced. In response to the post-trial court's questioning, Hill continued to deny initiating or engaging the juror in discussion of these matters.

In contrast to Hill's testimony, Juror 785 averred at the hearing before the trial court and in an affidavit Murdaugh attached to his motion for a new trial[4] that Hill interrogated her about the social media posts and whether she had been in contact with her ex-husband. In the affidavit, Juror 785 related that Hill, knowing the juror's fears about her ex-husband, informed her that law enforcement officers questioned the ex-husband about the posts, offered to reinstate restraining orders Juror 785 had against him, and speculated that the "the Murdaughs probably got to" the ex-husband when he called Juror 785 on the morning of the verdict. Juror 785 asserted Hill asked her whether she and the other jurors were inclined to vote guilty or not and told her that everything Murdaugh said had been lies. She also stated that before Murdaugh testified, Hill told the jurors not to be "fooled by" the evidence Murdaugh's attorneys presented.

Rhonda McElveen, the Barnwell County Clerk of Court who assisted Hill with the trial, testified that Hill repeatedly told her she wanted to write a book so she could buy a lake house, and a guilty verdict would be the best way to sell books. McElveen testified that, after hearing Hill had given a juror a ride home, McElveen counseled

---

[3] When the trial court dismissed Juror 785, she said her belongings left in the jury room included a dozen eggs, which another juror had brought her; she then became known as the "Egg Juror" or "Egg Lady."

[4] Although the post-trial court did not allow Juror 785 to testify, her affidavit is in the record for our consideration.

her that it was inappropriate, and while Hill admitted she gave the juror a ride, she claimed the bailiff was with them, and they did not discuss the case.[5] Although McElveen did not hear Hill say anything inappropriate to the jurors, she stated that Hill made comments to her, staff, and media members strikingly similar to those Juror Z reported, such as advising them not to be fooled by Murdaugh's attorneys and to look at Murdaugh's actions and movements while he testified. Finally, McElveen testified that Hill seated a writer with court personnel; this writer wrote the foreword for Hill's book.

Next, Murdaugh called the alternate juror to testify. She described the incident in which Hill made her comments before Murdaugh put up his case, stating that while the jurors were assembled in one of the two jury rooms or were standing in the hall, Hill stood at the doorway and told them, "They're going to say things that will try to confuse you. Don't let them confuse you or convince you or throw you off." The alternate juror also testified that Hill told the jurors not to be nervous, and "Don't be afraid to show your emotions because that's what they want to see." The alternate juror related she heard a court staff member say deliberations should not take long, but she could not remember who said it.

In its order, the post-trial court declared the burden was on Murdaugh to show both an external influence on the jury and prejudice from that influence. It then found Hill made improper comments to the jurors on the day Murdaugh testified, e.g., "this is an important day" or "this is an epic day" and that they should watch Murdaugh's body language. The post-trial court determined Hill's denial of making these statements was not credible, finding Hill wanted to write a book, which she believed a guilty verdict would help sell; she was "attracted by the siren call of celebrity"; and "[s]he allowed her desire for the public attention of the moment to overcome her duty to her oath of office and her oath as a witness."

Next, the post-trial court found that these comments did not affect any juror's verdict. It explained Juror Z's assertions that Hill's comments affected her verdict were ambivalent, self-contradictory, and not credible, emphasizing Juror Z had acknowledged her statement in her affidavit that she had voted guilty due to pressure from other jurors was the "more accurate statement." The post-trial court further found that Hill's comments "were limited in subject and not overt as to opinion, were only heard by, at most, three jurors, and were made in a case with overwhelming and compelling evidence," and that the trial court's extensive instructions cured any

---

[5] At the hearing, Hill denied giving a juror a ride home.

effect from these comments. The post-trial court concluded that while it found Murdaugh had failed to meet his burden to prove prejudice, any presumption of prejudice was overcome. It, therefore, denied Murdaugh's motion for a new trial. Murdaugh timely appealed to the court of appeals. This Court certified the appeal of the denial of the motion for new trial and subsequently consolidated it with the direct appeal.

## II.     Law and Analysis

### A.     *Remmer* Presumption of Prejudice

Murdaugh argues he was denied his constitutional right to a fair trial by an impartial jury free from outside influences. He asserts that following *Remmer v. United States*, 347 U.S. 227 (1954) (*Remmer I*), prejudice should be presumed from Hill's comments to the jury and that the presumption is irrebuttable. In the alternative, he contends the State failed to rebut the presumption of prejudice.

The State argues the jury convicted Murdaugh "because he was obviously guilty, and not because three jurors heard Hill's 'foolish and fleeting' comments about his upcoming testimony." It contends that the post-trial court correctly declined to presume prejudice, and any presumption of prejudice was rebuttable.

We agree with Murdaugh. Prejudice is presumed from Hill's comments, and while this presumption is rebuttable, the State failed to overcome this presumption.

Our federal and state constitutions guarantee a criminal defendant the right to a fair trial by an impartial jury. U.S. Const. amend. VI; S.C. Const. art. I, § 14. "No right touches more the heart of fairness in a trial" than the right to an impartial jury. *Barnes v. Joyner*, 751 F.3d 229, 240 (4th Cir. 2014) (quoting *Stockton v. Virginia*, 852 F.2d 740, 743 (4th Cir. 1988)). This "right can be infringed when a third party makes improper contact with the jury, for the right is meaningful only if the jury remains free from outside influence, including exposure to evidence or information that has not been introduced during the trial." *State v. Green*, 427 S.C. 223, 235, 830 S.E.2d 711, 716 (Ct. App. 2019) (*Green I*), *aff'd as modified*, 432 S.C. 97, 851 S.E.2d 440 (2020) (*Green II*). To protect the right to an impartial jury in such cases, the Supreme Court of the United States created a rebuttable presumption of prejudice (the *Remmer* presumption) elucidating:

> [A]ny private communication, contact, or tampering directly or indirectly, with a juror during a trial about the

matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Remmer I*, 347 U.S. at 229.

The United States Court of Appeals for the Fourth Circuit noted that in addition to the presumption of prejudice, "*Remmer* established a separate, but related requirement that a defendant be entitled to a hearing when the defendant presents a credible allegation of communications or contact between a third party and a juror concerning the matter pending before the jury." *Barnes*, 751 F.3d at 243.

The Fourth Circuit established a three-step test for considering extrajudicial contacts with the jury:

The party who is attacking the verdict bears the initial burden of introducing competent evidence that the extrajudicial communications or contacts were more than innocuous interventions. If this minimal standard is satisfied, the *Remmer I* presumption is triggered automatically. The burden then shifts to the prevailing party to prove that there exists no reasonable possibility that the jury's verdict was influenced by an improper communication.

*United States v. Cheek*, 94 F.3d 136, 141 (4th Cir. 1996) (cleaned up).

The Fourth Circuit further provided that in determining whether the extrajudicial contact was innocuous or whether it triggered the presumption, the court considers whether there was: "(1) any private communication; (2) any private contact; (3) any tampering; (4) directly or indirectly with a juror during trial; (5) about the matter before the jury." *Id.* (citing *Remmer I*, 347 U.S. at 229). "An unauthorized contact between a third party and a juror concerns the matter pending before the jury when

it is 'of such a character as to reasonably draw into question the integrity of the verdict.'" *Barnes*, 751 F.3d at 248 (quoting *Stockton*, 852 F.2d at 743).

Once the *Remmer* presumption is triggered, the State bears the heavy burden of proving "there is no reasonable possibility that the verdict was affected by the contact." *Cheek*, 94 F.3d at 142. The "court must examine the 'entire picture,' including the factual circumstances and the impact on the juror." *Id.* (quoting *Remmer v. United States*, 350 U.S. 377, 379 (1956) (*Remmer II*)). In determining whether the State met its burden of rebutting the *Remmer* presumption, courts consider a variety of factors such as "the extent of the improper communication, the extent to which the communication was discussed and considered by the jury, the type of information communicated, the timing of the exposure, and the strength of the [State's] case." *United States v. Basham*, 561 F.3d 302, 320 (4th Cir. 2009); *see State v. Kelly*, 331 S.C. 132, 141-42, 502 S.E.2d 99, 104 (1998) ("Relevant factors to be considered in determining whether outside influences have affected the jury are the number of jurors exposed, the weight of the evidence properly before the jury, and the likelihood that curative measures were effective in reducing the prejudice."). "[T]he extent of the communication [is] the most important factor." *Basham*, 561 F.3d at 320.

In *Parker v. Gladden*, the Supreme Court recognized the extreme prejudice inherent in statements concerning the matter at trial when made by an officer of the court.[6] 385 U.S. 363, 365 (1966). There, a bailiff, who oversaw a sequestered jury during an eight-day trial, stated to a juror, in the presence of other jurors, "Oh that wicked fellow (petitioner), he is guilty." *Id.* at 363. The bailiff also told another juror "If there is anything wrong (in finding petitioner guilty) the Supreme Court will correct it." *Id.* at 363-64. At least one juror or alternate overheard the statements. *Id.* at 364. In rejecting the State's argument that no prejudice was shown, the Supreme Court explained, "This [argument] overlooks the fact that the official character of the bailiff—as an officer of the court as well as the State—beyond question carries great weight with a jury which he had been shepherding for eight days and nights." *Id.* at 365. Although the Supreme Court noted the twenty-six hour jury deliberations and one juror's testimony she was prejudiced also supported the trial court's finding of prejudice, it held "that the unauthorized conduct of the bailiff 'involves such a probability that prejudice will result that it is deemed inherently lacking in due process.'" *Id.* (quoting *Estes v. Texas*, 381 U.S. 532, 542-43 (1965)). It further recognized that "'it would be blinking reality not to recognize the extreme prejudice

---

[6] The Supreme Court did not apply the *Remmer* analysis.

inherent' in such statements that reached at least three members of the jury and one alternate member." *Id.* (quoting *Turner v. Louisiana*, 379 U.S. 466, 473 (1965)).

However, not all comments by officers of the court are prejudicial. In *Green*, a juror asked a bailiff "what would happen in the event of a deadlock, and he responded the judge would likely give them an *Allen*[7] charge and ask if they could stay later." *Green I*, 427 S.C. at 229, 830 S.E.2d at 713. While the court of appeals held the State overcame the *Remmer* presumption, this Court held the bailiff's comments did not trigger the presumption. *Green II*, 432 S.C. at 99-100, 851 S.E.2d at 441. We explained that "[o]ur unwillingness to categorically apply the *Remmer* presumption of prejudice stems from our view that not every inappropriate comment by a bailiff to a juror rises to the level of constitutional error." *Id.* at 100, 851 S.E.2d at 441.

As the Fourth Circuit recognized, "there is a split among the circuits regarding the issue whether the *Remmer* presumption has survived intact following" the Supreme Court's decisions in *Smith v. Phillips*, 455 U.S. 209 (1982), and *United States v. Olano*, 507 U.S. 725 (1993).[8] *United States v. Lawson*, 677 F.3d 629, 642-44 (4th Cir. 2012) (collecting cases and recognizing the split in the circuits).

In *Phillips*, the Supreme Court declined to impute bias to a juror who applied for a job in the prosecutor's office during Phillips' trial. 455 U.S. at 212, 218. In reversing the grant of federal habeas relief, the Supreme Court declared "that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Id.* at 215. The Court explained that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Id.* at 217. Instead, due process necessitates "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to

---

[7] *Allen v. United States*, 164 U.S. 492 (1896).

[8] In both *Phillips* and *Olano*, the Supreme Court noted the cases' procedural postures informed the outcomes. *See Phillips*, 455 U.S. at 218 ("Of equal importance, this case is a federal habeas action in which [the trial court's] findings are presumptively correct under 28 U.S.C. § 2254(d)."); *Olano*, 507 U.S. at 730 (applying plain error standard because Olano did not object to the alternate jurors' presence in the jury room); *Olano*, 507 U.S. 736 ("The Court of Appeals should correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" (alteration in original) (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)).

prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.*

In *Olano*, the Supreme Court considered whether the presence of alternate jurors during jury deliberations was a "plain error" that the court of appeals was authorized to correct under Federal Rule of Criminal Procedure 52(b). 507 U.S. at 730. Noting the alternate jurors' presence was not the type of error that affected "substantial rights independent of its prejudicial impact," the Court found "no reason to presume prejudice." *Id.* at 737 (quoting. F. R. Crim. P. 52(b)). It explained, "There may be cases where an intrusion should be presumed prejudicial, but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict?" *Id.* at 739 (citations omitted).

Neither *Phillips* nor *Olano* expressly overruled the *Remmer* presumption. Indeed, in *Olano*, the Court specifically recognized that prejudice should be presumed from certain intrusions, just not from alternate jurors, who have been properly instructed not to deliberate, sitting in on the deliberations of a jury. 507 U.S. at 739. The Fourth Circuit rejected the argument that the Supreme Court overturned the *Remmer* presumption of prejudice attached to extrajudicial communications with the jury, declaring the presumption remained "[a]live and well in the Fourth Circuit." *Lawson*, 677 F.3d at 642; *see Barnes*, 751 F.3d at 243 (noting "the *Remmer* presumption is clearly established federal law . . . even after the Supreme Court's decisions in *Phillips* and *Olano*"); *Barnes*, 751 F.3d at 246 (concluding North Carolina state court's "adjudication of Barnes'[s] juror misconduct claim" without allowing a hearing on the claim or following the *Remmer* presumption "amounted to an unreasonable application of clearly established federal law"); *Jenkins v. State*, 825 A.2d 1008, 1026 (Md. 2003) ("While [*Phillips*] and *Olano* may somewhat limit the scope of presumptive prejudice, they do not preclude such a presumption in all situations, *i.e.*, where excessive or egregious jury misconduct or improper contact by a third party occurs.").

The Fourth Circuit explained the *Remmer* presumption applies in cases where "the danger is not one of juror impairment or predisposition, but rather the effect of *an extraneous communication upon the deliberative process* of the jury." *Barnes*, 751 F.3d at 242 (quoting *Stockton*, 852 F.2d at 744). Thus, "[t]he distinction between internal and external jury influences is critical because, unlike external influences, which '*necessitate a thorough judicial inquiry*, no such obligation is imposed with regard to an internal jury influence.'" *Id.* at 245-46 (quoting *Wolfe v. Johnson*, 565 F.3d 140, 161 (4th Cir. 2009)); *State v. Zeigler*, 364 S.C. 94, 110, 610 S.E.2d 859,

867 (Ct. App. 2005) ("External influence on a jury involves situations where jurors receive information during deliberations from some outside source" while "[i]nternal influences involve information coming from the jurors themselves."); *see, e.g.*, *Remmer I,* 347 U.S. at 229-30 (remanding for a hearing when a juror was offered a bribe during trial and later was investigated by an FBI agent); *Turner*, 379 U.S. at 467–71 (finding a defendant was denied the right to a trial by an impartial jury when two deputy sheriffs, who were key prosecution witnesses, were responsible for the sequestration of the jury during which time they "ate with [the jury], conversed with them, and did errands for them," even where there was no evidence that the deputies discussed the case with the jurors); *Fullwood v. Lee*, 290 F.3d 663, 681-82 (4th Cir. 2002) (holding defendant should have been afforded a hearing to determine whether a juror's husband repeatedly instructing her to vote for a death sentence would entitle defendant to relief was proven); *Cheek*, 94 F.3d at 144 (holding a defendant was entitled to a presumption of prejudice from his co-defendant's attempt to bribe a juror and the State failed to rebut the presumption); *Stockton*, 852 F.2d at 743-45 (holding the presumption of prejudice attached when a local restaurant owner suggested to jurors in a capital case that "they ought to fry the son of a bitch"); *State v. Cameron*, 311 S.C. 204, 208, 428 S.E.2d 10, 12 (Ct. App. 1993) (holding a bailiff's response to the foreperson that the jury should not worry if they were deadlocked over the issue of mercy "because the judge was fair" was prejudicial because it was misleading and "tended to lessen the jury's sense of responsibility by implying that if they rendered a verdict of guilty without mercy, the judge had some discretion in sentencing").[9]

Our decision in *Green II* did not deviate from *Remmer* or its Fourth Circuit progeny. Adhering to *Remmer*, we held only that the facts of the case did not warrant applying the presumption, while leaving in place the court of appeals' holding that the trial court must follow the *Remmer* procedure when it learns of an allegedly improper contact with the juror.  *Green II*, 432 S.C. at 100, 851 S.E.2d at 441; *see Green I*, 427 S.C. at 235, 830 S.E.2d at 717 (holding that "[i]n the event the trial court learns of an allegedly improper contact with a juror, the procedure of *Remmer v. United States* must be followed").  The Fourth Circuit has long recognized "that certain kinds of extrajudicial contacts may amount to nothing more than innocuous

---

[9] The post-trial court erred as a matter of law in relying on *State v. Aldret*, 333 S.C. 307, 314, 509 S.E.2d 811, 814 (1999) in holding that the defendant must demonstrate prejudice from jury misconduct in order to be entitled to a new trial.  *Aldret* addressed the issue of premature deliberations, a form of internal jury influence.  *Id.* at 310-11, 509 S.E.2d at 812-13.

interventions that simply could not justify a presumption of prejudicial effect." *Haley v. Blue Ridge Transfer Co.*, 802 F.2d 1532, 1537 n.9 (4th Cir. 1986).

We acknowledge that this Court has not always employed the *Remmer* presumption when considering external influences on the jury. In *Kelly*, an appellant asserted the trial court erred in denying his motion for mistrial when a capital case juror shared a pro-death penalty pamphlet in the jury room during the penalty phase of the trial. 331 S.C. at 139, 502 S.E.2d at 103. Because the appellant framed the issue on appeal as the denial of a mistrial, the Court noted that "In order to receive a mistrial, the defendant must show error and resulting prejudice" and held the appellant failed to show prejudice. *Id.* at 142, 502 S.E.2d at 104. We did not discuss *Remmer*.

In *State v. Bryant*, 354 S.C. 390, 391-96, 581 S.E.2d 157, 158-61 (2003), a death penalty appellant moved for a new trial after discovering detectives from the same police department as the victim contacted jurors' families, after the jurors were death penalty qualified, but before the jury was selected. Citing *Remmer* and *Phillips*, this Court held that "[i]n cases where a juror's partiality is questioned after trial, it is appropriate to conduct a hearing in which the defendant has the opportunity to prove actual juror bias." *Id.* at 395, 581 S.E.2d at 160. We noted the detectives' actions "could have been perceived as an attempt to intimidate jurors" and concluded that "[g]iven the nature of the case, the timing of the inquiries, and the questions which were asked," the jury could not have been fair and impartial. *Id.* at 396-97, 581 S.E.2d at 161. Thus, while we did not discuss *Remmer*'s rebuttable presumption, we essentially followed the procedure, recognizing that *Remmer* and *Phillips* entitled the appellant to a hearing in which he had the initial burden of proving the detectives' actions were more than innocuous interventions and then rejecting the State's argument that the appellant was not prejudiced. *Id.* at 392, 395-97, 581 S.E.2d at 159-61; *see generally Cheek*, 94 F.3d at 141 (discussing the three-step analysis when analyzing alleged improper third-party contact with a juror).

We clarify today that when faced with a third party's improper contact with a juror, our courts should follow the Fourth Circuit's three-step analysis as set forth in *Cheek*, and (1) require the defendant to meet the initial burden by presenting evidence that contacts were "more than innocuous interventions;" (2) if this minimal standard is satisfied, recognize the *Remmer* presumption is triggered automatically; and (3) shift the burden to the prevailing party to prove that there exists no reasonable possibility that the jury's verdict was influenced by an improper communication. *Cheek*, 94 F.3d at 141 (quoting *Haley*, 802 F.2d at 1537 n.9).

Under this framework, we turn to the facts at hand. First, we must determine which comments Hill made to the jurors. The post-trial court referenced only a few of the comments the jurors testified she made, e.g., "this is an important day" or "this is an epic day" and to watch Murdaugh's body language. The State argues the post-trial court implicitly rejected the other alleged comments as not being credible. We find this argument is without merit.

The post-trial court gave no indication it found the other comments not credible, nor would the record support such a finding. Indeed, the post-trial court found Hill's denial of making any inappropriate comments lacked credibility.[10] The post-trial court made no distinction regarding the comments it referenced in its order and the remaining comments that are in the record. The post-trial court, in fact, found credible Juror Z's affidavit statement concerning pressure from other jurors. This same affidavit included Juror Z's recollection of Hill's comments "not to be fooled" by the evidence presented by Murdaugh's attorneys and Hill's instructions to "watch [Murdaugh] closely," "look at his actions," and "look at his movements." The State offers no rationale for finding part of the affidavit credible while rejecting the portions that are damaging to the State's case. Juror Z's recollection of Hill's comments was consistent with Juror 785's affidavit testimony that Hill told the jurors not to be fooled by the evidence Murdaugh's defense presented. Juror Z's recollection is also consistent with the alternate juror's testimony concerning Hill's comments, "They're going to say things that will try to confuse you. Don't let them confuse you or convince you or throw you off."[11] These comments were also strikingly similar to the comments Hill made to McElveen, other staff members, and the media when away from the jury.

Furthermore, Hill's attempt to insert herself into the jury's deliberations through these comments was in line with her stated desire for a guilty verdict to sell more copies of the book she planned to write; her meddling in events around Juror 785's dismissal; and her self-aggrandizing conduct throughout and after the trial, from granting favors to media members such as allowing them to view sealed exhibits and sitting a writer with court staff in the courtroom to granting interviews. As the post-trial court found, "Hill was attracted by the siren call of celebrity" and "allowed her

---

[10] Hill's lack of credibility during the hearing on Murdaugh's motion for new trial is further evidenced by her recent guilty plea to perjury stemming from the hearing for her denial of allowing members of the press to view the sealed exhibits.

[11] The post-trial court did not make a finding on the alternate juror's credibility.

desire for the public attention of the moment to overcome her duty to her oath of office."

We have no reason to find Hill did not make all of the statements the jurors reported. Therefore, we hold Murdaugh established Hill made comments that the day Murdaugh testified was "epic" or "important" and urged the jurors not to be "fooled," "confused," "thrown off," or "convinced" by Murdaugh and to watch Murdaugh's body language closely.

Next, we must decide whether these comments were "more than innocuous interventions," *Cheek*, 94 F.3d at 141 (quoting *Haley*, 802 F.2d at 1537 n.9), and "of such a character as to reasonably draw into question the integrity of the verdict," *Barnes*, 751 F.3d at 244 (quoting *Stockton*, 852 F.2d at 743). Hill's statements were more comparable to those of the bailiff in *Parker* than those of the bailiff in *Green*. Like the bailiff's statements in *Parker*, Hill's comments attacked the defendant's character and credibility, which certainly were matters before the jury. *See Parker*, 385 U.S. at 363 (reporting a bailiff told jurors "Oh that wicked fellow (petitioner), he is guilty"); *State v. Reyes*, 432 S.C. 394, 401, 853 S.E.2d 334, 338 (2020) (stating "the credibility of a witness is exclusively for the jury to decide"). Hill became a character witness on behalf of the State, encouraging the jurors to question Murdaugh's credibility. *Ethier v. Fairfield Mem'l Hosp.*, 429 S.C. 649, 657, 842 S.E.2d 355, 360 (2020) (holding a plaintiff in a medical malpractice case was prejudiced when a juror who worked with the defendant doctor vouched that he was a good, reliable doctor and explaining the doctor "received the benefit of having a character witness on the jury who could attest to his skill without being subjected to cross-examination"). In fact, by urging the jurors not to be fooled or convinced by Murdaugh's defense, Hill essentially implored the jurors to find him guilty, the ultimate issue in the case. Even Hill's seemingly innocuous comments that the day Murdaugh testified was an "epic" or "important" day became nefarious when considered with her other comments, insinuating that there was something unusual and suspicious about his decision to testify. In contrast, the bailiff's statements in *Green* "though improper—did not touch the merits, but dealt only with the procedural question of how the judge might handle a jury impasse that apparently never materialized." *Green II*, 432 S.C. at 100, 851 S.E.2d at 441. Therefore, we hold Murdaugh met the "minimal standard" of showing that "the extrajudicial communications or contacts were 'more than innocuous interventions,'" *Cheek*, 94 F.3d at 141 (quoting *Haley*, 802 F.2d at 1537 n.9), and the post-trial court erred as a matter of law in refusing to impose the *Remmer* presumption.

Our following consideration is whether the State met its heavy burden of proving "there is no reasonable possibility that the verdict was affected" by Hill's comments. *Cheek*, 94 F.3d at 142. As stated above, the post-trial court analyzed the evidence before it by erroneously imposing the burden of proof of prejudice on Murdaugh. Furthermore, as Murdaugh argues, the post-trial court erred in considering testimony from the jurors about whether Hill's comments affected their verdict because this testimony violated Rule 606(b) of the South Carolina Rules of Evidence (SCRE).

Rule 606(b), SCRE, limits the testimony a juror may give on the issue of prejudice. This rule provides,

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

In interpreting court rules, this Court applies "the same rules of construction used to interpret statutes." *Ex parte Wilson*, 367 S.C. 7, 15, 625 S.E.2d 205, 209 (2005). Thus, "[i]f a rule's language is plain, unambiguous, and conveys a clear meaning, interpretation is unnecessary and the stated meaning should be enforced." *Id.* We must "consider not only the particular clause in which a word may be used, but the word and its meaning in conjunction with the purpose of the whole rule and the policy of the rule." *Id.* In addition, when a South Carolina rule is substantially the same as its federal counterpart, we may consider federal cases in interpreting the rule. *See, e.g.*, *Zurich Am. Ins. Co. of Ill. v. Palmetto Cont. Servs., Inc.*, 434 S.C. 104, 110, 862 S.E.2d 714, 717 (Ct. App. 2021) (considering federal cases when interpreting a state rule of civil procedure); *Renaissance Enters., Inc. v. Ocean Resorts, Inc.*, 334 S.C. 324, 327, 513 S.E.2d 617, 619 (1999) (same).

The United States Supreme Court explained Federal Rule of Evidence 606(b)—our Rule 606(b)'s federal counterpart—"is grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extrinsic influences." *Tanner v. United States*, 483 U.S. 107, 121 (1987). In *Tanner*, the Supreme Court examined the legislative history of Federal Rule of Evidence 606(b), setting forth the rationale for the rule:

> Public policy requires a finality to litigation. And common fairness requires that absolute privacy be preserved for jurors to engage in the full and free debate necessary to the attainment of just verdicts. Jurors will not be able to function effectively if their deliberations are to be scrutinized in post-trial litigation. In the interest of protecting the jury system and the citizens who make it work, [R]ule 606 should not permit any inquiry into the internal deliberations of the jurors.

*Id.* at 124-25 (quoting S. Rep. No. 93-1277 at 13-14 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7060).

The Supreme Court noted its "holdings requiring an evidentiary hearing where extrinsic influence or relationships have tainted the deliberations do not detract from, but rather harmonize with, the weighty government interest in insulating the jury's deliberative process." *Tanner*, 483 U.S. at 120. Thus, while a "'probing factual inquiry' [is] not only permissible but necessary" when a third party makes extrajudicial contact with a juror, the rule "prohibits all inquiry into a juror's mental process in connection with the verdict." *Cheek*, 94 F.3d at 143 (quoting *Haley*, 802 F.2d at 1535 n.1); *see* 27 *Wright & Miller's Federal Practice & Procedure* § 6075 (2d. ed. 2007) ("Most courts preclude jurors from testifying as to the effect on their verdict of extraneous information or outside influence.").

The Fourth Circuit noted that "[b]y asking [a juror] whether he had listened to and considered all the evidence, the government was delving into [the juror's] mental processes about the sufficiency of the evidence in reaching his personal verdict. Such an inquiry exceeded the strict limits imposed by Rule 606(b)." *Cheek*, 94 F.3d at 143. It further held that the district court erred "[b]y relying on [the juror's] mental processes in connection with the verdict when formulating its findings of fact." *Id.*; *Bibbins v. Dalsheim*, 21 F.3d 13, 17 (2d Cir. 1994) (holding a juror's affidavit was "inadmissible to the extent that it recounts how [another juror's] disclosure affected the thinking and voting of individual jurors or the deliberations of the jury as a

whole, including the tally of votes"); *United States v. Blumeyer*, 62 F.3d 1013, 1014 n.1 (8th Cir. 1995) ("To the extent that the District Court used testimony barred by Rule 606(b) to make its findings of fact, the court abused its discretion.").

We find that the plain language of Rule 606(b), SCRE, authorizes jurors to testify about improper extraneous comments by a third party but not on the comments' effects on the jurors' deliberative process. While, as the Fourth Circuit recognized, "Rule 606(b) at times makes it more difficult to determine whether a new trial is warranted[,] . . . sound policy supports the rule and outweighs any inconvenience or difficulty the rule imposes." *Cheek*, 94 F.3d at 144 (citation omitted). The State must meet its burden of rebutting the *Remmer* presumption without exceeding the limits of the Rule.[12] *See, e.g., United States v. Elbaz*, 52 F.4th 593, 607-08 (4th Cir. 2022) (holding the government rebutted the presumption of prejudice because the only juror who was exposed to the extrajudicial information was removed from the jury and the jury began deliberations anew with the alternate juror). We, therefore, hold that the post-trial court erred in questioning the jurors about whether Hill's comments influenced their verdicts and in relying on the jurors' answers in its prejudice analysis.

The State contends Murdaugh cannot complain about the post-trial court questioning Juror Z regarding her affidavit because Murdaugh submitted the affidavit to the post-trial court with his motion for a new trial. *See State v. Stanko*, 402 S.C. 252, 270, 741 S.E.2d 708, 717 (2013) ("Appellant cannot now complain of an error which his own conduct induced."), *overruled on other grounds by State v. Burdette*, 427 S.C. 490, 832 S.E.2d 575 (2019). We disagree. The purpose of Rule 606(b) is to preserve the sanctity of the jury room, "protecting the jury system and the citizens who make it work." *Tanner*, 483 U.S. at 125 (citation omitted); *State ex rel. Rosenthal v. Poe*, 98 S.W.3d 194, 209 n.7 (Tex. Crim. App. 2003) (Cochran, J., concurring) ("[W]e do not allow the parties or the public to impeach that verdict with evidence of what occurred between the jurors in the sanctity of that jury deliberation room."). This right was not Murdaugh's to waive. Thus, the portion of Juror Z's affidavit in which she disclosed her mental process in reaching her verdict was inadmissible. The post-

---

[12] We recognize that in *Ethier*, this Court held the affidavits and testimony from jurors describing whether another juror's premature deliberations affected their votes were admissible because premature deliberations may affect the fundamental fairness of the trial. *Id.* at 655, 842 S.E.2d at 358. We hereby overrule *Ethier* to the extent this case condoned the use of testimony about the jury's mental processes in reaching their verdict.

trial court erred in questioning her about that portion of the affidavit, and the post-trial court should not have considered that portion in ruling on the new trial motion.

We also hold the post-trial court erred in finding a lack of prejudice because Hill's comments were "limited in subject and not overt as to opinion, were only heard by, at most, three jurors, and were made in a case with overwhelming and compelling evidence." We reiterate the burden is on the State to rebut the presumption of prejudice. First, the post-trial court erred in finding Hill's comments were "limited in subject and not overt as to opinion." Hill clearly advised the jurors to find Murdaugh and the evidence he presented not credible and, essentially, urged them to render a guilty verdict. Hill's position as the Colleton County Clerk of Court, an officer of the court who managed the trial and was the primary caretaker of the jury, amplified the impact Hill's comments had on the jury. *See Parker*, 385 U.S. at 365 (noting "the official character of the bailiff—as an officer of the court as well as the State—beyond question carries great weight with a jury"); *McCormick Cnty. Council v. Butler*, 361 S.C. 92, 93, 603 S.E.2d 586, 586 (2004) ("The office of clerk of court is an elected one, created by Article V, § 24 of the South Carolina Constitution."). Hill was elected by the very people who make up the Colleton County jury pool.

Next, the limited number of jurors who acknowledged hearing Hill's improper comments did not reduce their prejudicial effect. As the Supreme Court explained, a criminal defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors." *Parker*, 385 U.S. at 366. In addition, in the context of a jury tainted by external influences, the strength of the State's case does not necessarily warrant a finding that the State met its burden of proving a lack of prejudice. The State certainly produced considerable evidence here, and arguably, reasonable minds may debate whether the evidence here was overwhelming. In the situation before us, notwithstanding "the strength" of the prosecution's case, the State is unable to overcome the presumption of prejudice. The State's case rested largely on circumstantial evidence, and Murdaugh's credibility was a key component of his defense. Hill's repeated comments challenging Murdaugh's credibility directly undermined that defense. Hill's egregious, improper jury interference went to the heart of the case and unquestionably was intended to push the jury to a guilty verdict. *See Barnes v. Thomas*, 938 F.3d 526, 536 (2019) ("[W]e are not convinced that the strength of the State's case against Barnes precludes us from holding that Barnes has shown actual prejudice. The focus of the harmless error inquiry is 'not on the sufficiency of the evidence absent the error, but rather on the impact of the error on the jury's verdict.'" (quoting *Sherman v. Smith*, 89 F.3d 1134, 1155 (4th Cir. 1996) (Motz, J., concurring in part and dissenting in part))). The breathtaking and

disgraceful effort of Hill to undermine the jury process is unprecedented in South Carolina.

Finally, we hold the State has not met its burden of proving the trial court's instructions to the jury cured any prejudice arising from Hill's comments. Generally, "[a]n instruction to disregard incompetent evidence is . . . deemed to have cured the error." *State v. Grovenstein*, 335 S.C. 347, 353, 517 S.E.2d 216, 219 (1999). "Moreover, jurors are presumed to follow the law as instructed to them." *Id.* at 353-54, 517 S.E.2d at 219 (holding that any prejudice caused by the alternate juror's presence in the jury room as deliberations began was cured by the trial court's instructions to disregard anything the alternate juror said and its thorough inquiry of the jurors to confirm they could put the alternate juror's words aside). Here, the trial court gave the standard instructions and admonishments to the jury, none of which provided guidance on what to do when the Colleton County Clerk of Court, an officer of the court, made comments disparaging Murdaugh's credibility and urging the jury to reject his defense. The trial court never had the opportunity to even attempt to cure the prejudicial effect of Hill's comments because they did not come to light until months after the trial. If we were to accept the proposition that standard charges could cure such prejudice, then no defendant would be entitled to relief when improper extrajudicial information reaches the jury's ears, regardless of its content or context. Our federal and state constitutions simply cannot countenance such an assault on the right to a fair and impartial jury.

In summation, Murdaugh met his initial burden of establishing Hill's comments to the jury were more than innocuous interventions, triggering the *Remmer* presumption of prejudice and shifting the burden to the State. The State simply was unable to meet this heavy burden of proving that there exists no reasonable possibility that the jury's verdict was influenced by these highly improper comments. *See Cheek*, 94 F.3d at 142 ("To implement the heavy obligation of the party who seeks to rebut the presumption of prejudice, we have prescribed that the proof must establish that there is no reasonable possibility that the verdict was affected by the contact."). Accordingly, we hold Murdaugh's right to a fair trial by an impartial jury was violated, and the post-trial court erred in denying his motion for a new trial.

## B. Evidence of Murdaugh's Financial Crimes

Because we order a new trial on the basis of Hill's improper influence on the jury on appeal from the order denying Murdaugh's motion for a new trial, it is not necessary that we address the evidentiary issues Murdaugh raises on appeal from his

convictions and sentences.  We elect, however, to offer the trial court on remand the following guidance regarding the admissibility of evidence of Murdaugh's financial crimes.[13]

At the time of the trial, Murdaugh had been accused of and indicted for numerous financial crimes.  During his testimony before the jury, Murdaugh admitted he committed the financial crimes, although he had not at that time been convicted of anything.  After trial, he pled guilty to the financial crimes in both state and federal court.  He was sentenced to a concurrent twenty-seven years in state prison and forty years in federal prison.

The State sought to admit evidence of these financial crimes during Murdaugh's murder trial for the purpose of showing his motive for committing the murders.  The State filed a pretrial motion in which it argued the evidence demonstrated "Murdaugh accrued substantial debts over a period of years, and to cover those debts, began engaging in illicit financial crimes involving the theft and misappropriation of money from his clients and his own firm."  The State emphasized that several series of events unfolding in the weeks and days leading up the murders threatened to expose Murdaugh's financial crimes.  The State wrote in its motion, "All of these factors start to converge on June 7, 2021"—the date of the murders.  The State explained its motive theory: "the murders served as Murdaugh's means to shift the focus away from himself and buy himself some additional time to try and prevent his financial crimes from being uncovered."  The State also stressed Murdaugh's attempts to cover his financial misdeeds after the murders to support its theory of motive.

Murdaugh filed a memorandum arguing the financial crimes evidence should be excluded under Rules 402, 403, and 404(b), SCRE.  The trial court conducted a

---

[13] In addition to Murdaugh's challenge to the trial court's decision to admit evidence of his financial crimes, Murdaugh appealed the trial court's decision to: (1) allow the State to question a witness on redirect examination about the witness's knowledge of Murdaugh's financial situation; (2) admit evidence of firearm and tool mark analysis expert testimony; (3) admit evidence of four firearms seized from Moselle; (4) admit evidence of a blue raincoat collected from the home of Murdaugh's mother and gunshot residue expert testimony related to that raincoat; (5) allow the State to question Murdaugh on cross examination as to the reasons he did not reveal until trial his presence at the kennels on the night of the murders; and (6) admit evidence of an iPhone demonstration during the State's rebuttal case.

lengthy pretrial hearing but declined to rule on the admissibility of the financial crimes evidence at that time.

During various breaks in the course of the trial, the State presented the testimony of eight witnesses regarding Murdaugh's financial crimes outside the presence of the jury. After hearing this testimony and the arguments of both sides, the trial court found "all evidence of financial crimes that may likely have led to a motive, or lend itself to motive for the crime committed" was admissible. The trial court stated the jury was "entitled to consider whether the apparent desperation of Mr. Murdaugh, because of his dire financial situation, threat of being exposed [for] committing the crimes for which he was later charged with, resulted in the commission of the alleged crimes." The trial court also found:

> This evidence of other crimes is admissible and it's non-propensity, as it does not suggest to the jury that the defendant has a tendency to commit murder. I specifically find that these other crimes will not lure the jury into declaring guilt on a different ground than the specific charge.

The trial court found the evidence had sufficient probative value that was not substantially outweighed by any danger of unfair prejudice. The trial court issued a written order setting forth its ruling.

The State then presented testimony to the jury from the eight witnesses who testified earlier, along with two additional witnesses.[14] Through these witnesses, the State

---

[14] The eight witnesses who testified outside the jury's presence were Jeannie Seckinger, the chief financial officer of Murdaugh's law firm; Michael Gunn, a principal in Forge Consulting LLC; attorney Chris Wilson, Murdaugh's friend and his co-counsel in several cases; Jan Malinowski, who succeeded Russell Laffitte—Murdaugh's co-defendant and co-conspirator in the financial crimes—as president of Palmetto State Bank; Micheal "Tony" Satterfield, the son of Murdaugh's former housekeeper Gloria Satterfield; Carson Burney, a forensic accountant in the attorney general's office; attorney Mark Tinsley, Murdaugh's former friend and opposing counsel in a civil lawsuit involving a 2019 boat wreck in which Murdaugh was personally named as a defendant; and attorney Ronnie Crosby, Murdaugh's former law partner. The additional witnesses were Annette Griswold, Murdaugh's former paralegal; and Natasha Moodie, a consumer resolution associate at Bank of America.

proved Murdaugh committed wide-ranging financial crimes over numerous years in several general categories, including the following: (1) Murdaugh stole money from his clients by billing personal expenses to them under the guise of those expenses being costs associated with their cases; (2) Murdaugh stole money from his law firm by instructing law firm employees to make checks payable to "Palmetto State Bank," whose then-chief executive officer Russell Laffitte enabled Murdaugh to convert the funds for his personal use; (3) Murdaugh stole money from his clients and his law firm by instructing law firm employees to make checks payable to "Forge"—a fake account Murdaugh created to imitate the legitimate Forge Consulting LLC firm— that Murdaugh then deposited and used for personal expenses; and (4) Murdaugh stole money from Tony Satterfield by filing an insurance claim in relation to his mother Gloria Satterfield's death and collecting the insurance proceeds for personal use instead of providing the proceeds to Tony and Gloria's other son.

The State also presented evidence to the jury that Murdaugh's years of stealing money in these ways was about to be exposed. For example, law firm employees testified they asked Murdaugh on at least two occasions in the weeks leading up to the murders about discrepancies in his financial disbursement documents in individual cases. Jeannie Seckinger—the firm's chief financial officer—testified she confronted Murdaugh on the morning of the murders, stating, "I have reason to believe that you received [attorneys' fees in a certain case] directly to you, and you need to prove to me that you did not." Other evidence indicated Seckinger was referring to $792,000 in missing attorneys' fees the firm was supposed to receive from Murdaugh's co-counsel Chris Wilson. The State also presented evidence that Mark Tinsley—the attorney representing the family of the young woman who died in the boat wreck—had scheduled a motion hearing for three days after the murders in which Tinsley sought to compel Murdaugh to disclose his detailed financial records.

Murdaugh challenges the admissibility of evidence of his financial crimes under Rules 401 and 402, Rule 403, and Rule 404(b). *See* Rule 401, SCRE ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); Rule 402, SCRE ("All relevant evidence is admissible, except as otherwise provided . . . ."); Rule 403, SCRE ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."); Rule 404(b), SCRE ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible to show motive . . . .").

As to Murdaugh's relevance objection, the State argues that because Murdaugh was charged with murdering his wife and son—"seemingly inexplicable conduct when standing alone"—it was important that it offer evidence to explain why he did it. The State also argues "Murdaugh himself placed the issue of motive front and center through his own actions" by suggesting to officers who arrived at Moselle on June 7 that "the killer's motive stemmed from" the boat wreck.

We agree with the State that evidence of Murdaugh's financial crimes made the State's theory of motive more probable. *See State v. White*, 437 S.C. 490, 495, 879 S.E.2d 21, 24 (Ct. App. 2022) ("The test for relevancy is not stringent, and its standard is not difficult to vault . . . . Indeed, evidence that carries the probative weight of a feather tips a balanced scale and assists the jury in arriving at the truth of an issue." (citing *State v. Sweat*, 362 S.C. 117, 126-27, 606 S.E.2d 508, 513 (Ct. App. 2004))). Thus, we find the trial court acted within its discretion in finding the financial crimes evidence was relevant under Rule 401 and admissible under Rule 402.

The more difficult question is whether the trial court should have excluded all or some of the financial crimes evidence pursuant to Rule 404(b) or Rule 403. We address this question as two distinct categories of issues. The first of these categories—whether the trial court should have excluded *all* the financial crimes evidence—is a point on which not all members of the Court would have ruled the same way had we been the trial court. We each agree, however, this was a decision within the discretion of the trial court under the facts and circumstances that existed in Murdaugh's murder trial. *See State v. Heyward*, 441 S.C. 484, 504, 895 S.E.2d 658, 668-69 (2023) (discussing a trial court's proper exercise of discretion). As to the second category we will address—whether the trial court should have restricted the extent to which the State was allowed to present this evidence; that is, whether the trial court should have excluded *some* of the evidence—we unanimously hold the trial court allowed the State to go far too long and far too deep into aspects of Murdaugh's financial crimes that were not probative of the State's theory of motive, which gave rise to considerable danger of unfair prejudice, and therefore should have been excluded.

As to whether the trial court should have excluded all evidence of Murdaugh's financial crimes under Rules 403 or 404(b), we have discussed the principles applicable when a trial court is asked to exclude evidence of other crimes in numerous cases, and no further elaboration of those principles is necessary here. *See, e.g.*, *State v. Galloway*, 443 S.C. 229, 243, 904 S.E.2d 866, 874 (2024)

("[E]vidence of 'other crimes, wrongs, or acts' may not be admitted for the purpose of 'prov[ing] the character of a person in order to show action in conformity therewith.'" (quoting Rule 404(b)); *State v. Perry*, 430 S.C. 24, 29, 842 S.E.2d 654, 657 (2020) ("The rule is often stated in terms of 'propensity.'"); *State v. Benton*, 338 S.C. 151, 156, 526 S.E.2d 228, 230 (2000) ("Propensity evidence is admissible if offered for some purpose other than to show the accused is a bad person or he acted in conformity with his prior convictions."); *Perry*, 430 S.C. at 44, 842 S.E.2d at 665 ("The State must show a logical connection between the other crime and the crime charged such that the evidence of other crimes 'reasonably tends to prove a material fact in issue.'" (quoting *State v. Lyle*, 125 S.C. 406, 417, 118 S.E. 803, 807 (1923))); *State v. Clasby*, 385 S.C. 148, 155-56, 682 S.E.2d 892, 896 (2009) ("Even if prior bad act evidence . . . falls within an exception, it must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant." (quoting *State v. Gaines*, 380 S.C. 23, 29, 667 S.E.2d 728, 731 (2008)) (citing Rule 403, SCRE)).

As to Rule 404(b), the difficulty lies in the application of these principles to the facts and circumstances of any individual case. *Lyle*, 125 S.C. at 417, 118 S.E. at 807. Here, the trial court correctly understood the applicable principles of law and thoughtfully applied those principles to the facts and circumstances before it. The trial court explained its view of the logical connection between the financial crimes and Murdaugh's motive. The State's argument that it presented a valid theory of motive and Murdaugh's response that the "fabricated motive theory" is "illogical, implausible" and not supported by the evidence was not a dispute for the trial court to resolve by making this evidentiary ruling; that was for the jury. The trial court's job was to determine—in its discretion—whether the State's theory of motive was reasonably plausible, and if so, whether the evidence the State presented could reasonably support the theory. We agree with the State that—under the facts and circumstances in existence in Murdaugh's first trial—the trial court acted within its discretion in deciding not to exclude the evidence under Rule 404(b).

As to Rule 403, the trial court balanced the probative value of the evidence against its potential for unfair prejudice and concluded the probative value was not substantially outweighed by any unfair prejudice. The trial court specifically found Murdaugh's commission of the financial crimes "does not suggest to the jury that the defendant has a tendency to commit murder." As we will discuss below, we find considerable unfair prejudice in allowing the State to go as far and deep into detail as it did. However, we hold the trial court acted within its discretion in admitting *some* evidence of Murdaugh's financial crimes. *See Morris v. BB&T Corp.*, 438 S.C. 582, 587, 885 S.E.2d 394, 397 (2023) ("[W]hen a trial court's . . . thought process of

applying sound principles of law to the court's view of the facts and circumstances is evident in the record of proceedings in a hearing . . . , the appellate court will defer to the trial court's exercise of discretion, even when the judges on the appellate court might have made the decision differently.").

We emphasize, however, the trial court should have limited the State's presentation of this evidence. We illustrate this point with an example from the direct examination of Tony Satterfield:

> State:        Why were you the personal representative and not your brother?
> Satterfield:  Because my brother is a vulnerable adult and he has a disability.
> Court:        Can you repeat those words for me?
> Satterfield:  That my brother, he's a vulnerable adult and he's not able to function as a normal human being to deal with stuff like that.
> State:        He's a vulnerable adult?
> Satterfield:  Yes.

This particular testimony had zero probative value as to Murdaugh's motive for the murders, and obviously high potential for unfair prejudice as it portrays Murdaugh as a man who preys on vulnerable victims. *See* Rule 403, SCRE ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). Much of the additional details the State presented as to Murdaugh's financial crimes had little or no probative value for the purpose of establishing Murdaugh's motive. The State's theory of motive centers on the point that his financial crimes were about to be exposed and he needed time. The fact he committed some of those crimes against a vulnerable adult adds nothing to the theory. To the extent many similar details may have had minimal probative value, that value is substantially outweighed by the unfairly prejudicial sympathy the jury was likely to feel toward this victim. By our calculation, the State spent a total of 12.5 hours of actual testimony before the jury over ten days of trial to introduce evidence related to Murdaugh's financial crimes. We are convinced the State could have effectively presented evidence to support its motive theory in a fraction of that time.

By holding the trial court in this case acted within its discretion in admitting *some* evidence of Murdaugh's financial crimes, we certainly do not intend to require the evidence be admitted on retrial. As is often the case, the facts and circumstances on

retrial may be materially different from those presented in the initial trial. Thus, the trial court on remand must do as the trial court did here—carefully and thoughtfully apply correct principles of law to the facts and circumstances before it. We do intend to require, however, that if the trial court decides to admit evidence of Murdaugh's financial crimes on retrial, the State must complete its introduction of that evidence efficiently without the lengthy presentation of inflammatory details with little to no probative value that was permitted in the first trial.

## III. CONCLUSION

As the Fourth Circuit declared, the *Remmer* presumption is "[a]live and well." *Lawson*, 677 F.3d at 642. It serves to protect the right to a fair trial by an impartial jury for *all* defendants. Here, Hill, the Colleton County Clerk of Court, egregiously attacked Murdaugh's credibility and his defense, thus triggering the presumption of prejudice, which the State was unable to rebut. As noted at the outset, Hill's shocking jury interference was accomplished outside the presence and knowledge of the outstanding trial judge and superbly competent and professional counsel for the State and the defense. We are accordingly constrained to reverse the post-trial court's denial of Murdaugh's motion and remand for a new trial consistent with this opinion.[15]

**REVERSED AND REMANDED.**

**KITTREDGE, C.J., FEW, JAMES, HILL, and VERDIN, JJ., concur.**

---

[15] We commend the post-trial court, which inherited Murdaugh's motion for a new trial and was placed in the unenviable position of evaluating unprecedented jury interference by a clerk of court within the context of a murky area of law.